STATE of Tennessee, Appellee,

v.

**John Timothy LAMBERT, Appellant.**

Court of Criminal Appeals of Tennessee, at Knoxville.

Aug. 24, 1987.

Permission to Appeal Denied by Supreme Court Nov. 9, 1987.

Robert C. Edwards, Richard E. Faires, (At trial only), Knoxville, for appellant.

W.J. Michael Cody, Atty. Gen., Kathy M. Principe, Asst. Atty. Gen., Nashville, William E. Dossett, Dist. Atty. Gen., William H. Crabtree, Robert L. Jolley, Jr., Asst. Dist. Atty. Gens., Knoxville, for appellee.

## OPINION

SCOTT, Judge.

The appellant was convicted of two counts of vehicular homicide as a proximate result of his intoxication in violation of TCA § 39–2–231(b). He received a sentence of twenty-one years in the state penitentiary for each count. He was also convicted of possession of marijuana and received a sentence of eleven months and twenty-nine days in the county jail. He was sentenced as a Range II, especially aggravated offender, and all of the sentences are to be served consecutively. Much aggrieved by his convictions, the appellant has presented seven issues on appeal. While he does not challenge the sufficiency of the convicting evidence, a narration of the facts is necessary for a full understanding of the issues presented.

On the night of August 10, 1984, Michael Jackson, the world famous entertainer, was presenting a concert at Neyland Stadium on the campus of the University of Tennessee. The university area of Knoxville was extremely crowded with automobiles and pedestrians.

The appellant went to the University Club to drink beer and hear the band. He parked his pickup truck in the parking lot of a Taco Bell located on Cumberland Avenue. The Assistant Manager of the Taco Bell, upon realizing that their parking lot was being used by noncustomers, decided to have their vehicles towed from the lot. A friend saw the appellant's truck being attached to a wrecker and told him his truck was about to be towed. The appellant hurried to his truck. After some discussion with the Assistant Manager of the Taco Bell and Robert Eugene (Monk) Newman, it was agreed that the appellant's truck would not be towed if he would remove it from the parking lot.

As the appellant went to his truck, he observed that the door lock on the driver's side was damaged and he accused Mr. Newman of causing the damage. He began loudly cursing Mr. Newman and the manager and a fight ensued between the appellant and Mr. Newman. During the altercation, the appellant attempted to get an ax from the back of the wrecker. However, Mr. Newman grabbed him around the neck with one arm and used his other arm to prevent the appellant from getting the ax. Immediately after this scuffle ended, the appellant attacked Mr. Newman with a pencil. Mr. Newman again grabbed the appellant around the neck and prevented him from doing anyone any harm. While this was going on, an employee of the Taco Bell called the Knoxville police. Before they arrived, the appellant was able to break loose from Mr. Newman. He ran to his truck to leave.

In the process of leaving, the appellant hit Mr. Newman's wrecker with his truck, then hit another wrecker that was working in the parking lot, and finally hit the door of Mr. Newman's wrecker, severely damaging the door. As the appellant entered the street, he hit a parked car. He went speeding down the center of Cumberland Avenue, which was clogged with traffic. He passed through several intersections, and almost hit a police officer who was directing traffic. Two police officers, upon observing the appellant, gave chase in their police cruiser with their blue lights flashing. However, the appellant did not heed the officers, but continued his wild flight. He turned south on Volunteer Boulevard and traveled approximately two blocks. At a curve in the street, located at the statue of the Volunteer, his truck jumped the grassy median and hit two pedestrians who were standing in the median. The truck became airborne and landed on top of a parked car. The appellant then jumped out of his truck and fled on foot.

There were numerous police officers in the area directing traffic, performing crowd control duties and undercover opera-

tions. One undercover officer gave chase on foot. The two police officers who were following in their cruiser arrived at the scene. As they were arriving, they hit the appellant, who ran out in front of their car as he sought to escape. However, he rolled over the hood of the car and continued his flight. A bystander observed what was happening, threw a body block at the appellant and brought him to the ground. The police officer who was chasing him and a number of other spectators piled on to assist in his apprehension.

The pedestrians who were standing in the median were Dr. Harold Neuenschwander, a prominent sixty-eight year old Knoxville physician, and his nine year old granddaughter, Lisa. They had attended the Michael Jackson concert and were leaving the stadium area at the time they were struck. Dr. Neuenschwander was dead on arrival at the University of Tennessee Hospital. The child was carried forward by the force of the impact and was found underneath a car. A nurse and a hospital orderly who were in the area provided first aid to the child and accompanied her to the emergency room of Fort Sanders Hospital where efforts to save her were unsuccessful. She had massive head injuries and her grandfather had massive head and chest injuries.

The appellant complained of injuries to his hand. He was taken to U.T. Hospital where an examination revealed that he was unharmed. A sample of his blood was taken at the hospital and analyzed. His blood alcohol level two hours after the incident was .08%. The toxicologist who testified about his blood alcohol level opined that the appellant's blood alcohol level at the time of the incident was somewhere between .08% and .13%.

A search of the appellant, conducted at the jail in connection with his booking, revealed a joint and some additional marijuana in his pocket. At the time of the incident the appellant was on probation for delivering marijuana and was not allowed to drink, frequent places selling alcohol, or be out that late at night.

The appellant admitted the Taco Bell incident and his wild trip along Cumberland Avenue. However, he testified that he sideswiped a car at the intersection of Cumberland and Volunteer and did not remember anything else about the events until he was in police custody. No other witness saw him hit a car at that intersection.

■ In the first issue the appellant contends that the trial judge erred by not allowing him to employ a psychological expert at state expense in order to properly evaluate him prior to trial.

The appellant made a pre-trial motion for a psychiatric examination and the trial judge inquired as to whether the appellant's competence was going to be an issue at trial. Defense counsel responded that he did not know at that time. It was suggested that the appellant could be examined at state expense by a psychiatrist at a state psychiatric hospital. The appellant chose not to be examined by a state psychiatrist and insanity was not raised as a defense at trial. The appellant argues that because his mental condition was relied upon in sentencing that "an examination of (his) inner thoughts" should have been allowed, his mental state being a substantial issue at trial and at sentencing.

The appellant contended at the sentencing hearing that one mitigating factor was that he was suffering from a mental condition or defect at the time of the offense, which significantly reduced his culpability. TCA § 40–35–110(9). The trial judge rejected that contention. The appellant also asked the trial judge to consider whether the act was committed under such unusual circumstances as to indicate that it was unlikely that the appellant had a sustained intent to violate the law. TCA § 40–35–110(12). The trial judge rejected that contention. As an enhancement factor the state advanced the position that the appellant had no hesitation about committing a crime where the risk to human life was high. TCA § 40–35–111(10). The trial judge accepted the state's contention.

Under these circumstances the appellant contends that it was error to deny his motion. He relies on *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 1097, 84 L.Ed.2d 53 (1985), where the United States Supreme

Court held that, when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the state must, at a minimum, assure him access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation and presentation of the defense. However, the United States Supreme Court went on to note that the defendant does not have a constitutional right to choose his own psychiatrist or to receive funds to hire his own.

In *Ake,* the defendant was charged with and convicted of two counts of murder in the first degree, a capital offense in Oklahoma. The majority opinion did not specifically state that the holding applies in noncapital cases. Chief Justice Burger in his concurrence limited the holding to capital cases and Justice (now Chief Justice) Rhenquist dissented, in part, because he saw the majority extending the constitutional right to psychiatric evaluation to noncapital cases.

Assuming, but not deciding, that *Ake* applies to non-capital cases, the appellant has failed to make the threshhold demonstration that his sanity would be an issue at trial. Without this showing, the state was under no obligation to provide a psychiatric evaluation at state expense. Indeed, the offer to have the appellant examined by a state psychiatrist at state expense was made and the appellant refused the offer.

It cannot be said every time "mental state" is an issue for sentencing purposes that the defendant's "sanity at the time of the offense" is a significant issue at trial, requiring a psychiatric examination. If that were the rule, it would be necessary to provide psychiatric examinations for virtually every defendant charged with a criminal offense, since intent, motive, desire, lack of hesitation, etc. are all "mental states" which affect guilt or sentencing. Furthermore, simply because the defense counsel has urged the court to take a particular position does not make that a "significant" issue in the case. Neither at trial nor at the sentencing hearing was there

one shred of evidence offered to show that the appellant's mental capacity was limited in any way whatsoever. This issue has no merit.

■ In the next issue the appellant contends that the trial judge erred by refusing to grant his motion for a continuance which was made on the second day of trial. At that time, just after jury selection had been completed, the appellant asked the trial judge for a continuance because he was dissatisfied with his court appointed counsel, and stated that he wanted time to retain counsel at his own expense. According to the appellant, he was then able to pay attorney's fees, because he had been employed since he was released on bond. He further asserted that he had been unable to communicate with his attorney due to a death in the attorney's family. He expressed his belief that his counsel was unprepared for trial and cited his counsel's failure to subpoena a witness as evidence of his unpreparedness. He also argued that since his attorney had represented Mr. Newman, the wrecker driver, in an unrelated case, that he had a conflict of interest which prevented him from properly representing the appellant.

As the appellant concedes, the decision whether to grant or deny a motion for continuance rests within the sound discretion of the trial judge. *State v. Martin,* 634 S.W.2d 639, 643 (Tenn.Cr.App.1982). Unless it is "clearly shown" that the trial judge abused his discretion, his action will not be disturbed on appeal. *State v. Melson,* 638 S.W.2d 342, 359 (Tenn.1982).

There is not even a hint, much less a clear showing, that the trial judge abused his discretion in denying the continuance. The eyewitness that the appellant wanted subpoenaed was already under subpoena by the state. However, she was unavailable because she was hospitalized recovering from the birth of her child by Caesarean section, the birth having occurred during the time the trial was going on. The transcript of her testimony at the preliminary hearing was available.

While the appellant's counsel had represented Mr. Newman on a totally unrelated

matter, there was no showing that this in any way affected his representation of this appellant.

Having acquired funds, the appellant was free to obtain counsel of his own choice, but he was not entitled to wait until the trial was in progress and then attempt to take control of the court's docket. This issue has no merit.

In the next issue the appellant contends that the trial judge erred by limiting the number of character witnesses that he could call at trial. Citing *Shields v. State*, 197 Tenn. 83, 270 S.W.2d 367, 371 (1954), the appellant contends that the court should not have a rule or make a rule "in advance of the adduction of evidence" limiting the number of witnesses in any case.

The Supreme Court made that statement in *Shields*. However, the Court went on to hold that the trial court is "vested with a sound discretion in regard to limiting the number of witnesses." Citing *Conlee v. Taylor*, 153 Tenn. 507, 285 S.W. 35, 39 (1926), from which the no advance limitation statement was drawn, the Court also noted that on proper occasions the court may and should in its discretion limit the number of witnesses on collateral matters. The character of the accused is a collateral matter.

In this case the appellant's character was not an issue *at trial* and he did not call any character witnesses during that phase of the proceeding. *At the sentencing hearing,* the trial judge limited to three the number of character witnesses that the appellant could call from his place of employment. He set no limitation on the number of character witnesses who could be called who knew the appellant from other circumstances. The appellant did not object to the limitation, nor did he make an offer of proof concerning what the proposed additional witnesses would have to say about his character.

It is clear then by failing to object, the appellant waived this issue. Rule 36(a), T.R.A.P., *Ezell v. State*, 220 Tenn. 11, 413 S.W.2d 678, 681 (1967). It is equally clear

that there was no abuse of discretion by the trial judge. This issue has no merit.

In the next issue the appellant contends that the trial judge erred by refusing to allow his counsel to question Roy Neuenschwander concerning the desires of the victims' family concerning sentencing.

At the sentencing hearing Mr. Neuenschwander, the son of Dr. Neuenschwander and uncle of Lisa Neuenschwander testified that he and his family believed that the appellant should receive the maximum sentence. This was consistent with his recommendation to the preparer of the pre-sentence report. The appellant attempted to elicit from Mr. Neuenschwander an admission that he had offered to recommend a lenient sentence in exchange for the appellant's cooperation in a pending civil suit. Mr. Neuenschwander denied this and the appellant offered no other proof to support his contention.

Thus, it can be seen that the appellant did question Mr. Neuenschwander concerning the family's desire about sentencing, and this issue has no merit.

In another issue the appellant contends that the trial judge erred by refusing to instruct the jury that when a defendant's blood alcohol level is less than .10% that no inference is created and the jury cannot infer that the defendant was under the influence of an intoxicant.

In this regard, the trial judge instructed the jury at two different places in the charge as follows:

If any person is found by means of a blood test to have ten hundredths of one percent (.10%) or more of alcohol in his blood, this shall create a rebuttable inference that such person was under the influence of such intoxicant, and that his ability to drive was thereby impaired sufficiently to constitute a violation of the law against driving while under the influence of alcohol. However, if the blood test shows an alcoholic content of five hundredths of one percent (.05%) or less, then no inference shall be created as to whether this person's ability to operate a motor vehicle was impaired.

These instructions were taken from T.P.I. —Crim. §§ 20.07 and 20.09 and comport with TCA § 55–10–408.

 The appellant relies on language from *State v. McKinney*, 605 S.W.2d 842, 846 (Tenn.Cr.App.1980), contending that the word "shall" should not have been used in the instructions, but rather the word "may" should have been substituted. In *McKinney*, the appellant argued that the trial judge should have explicitly charged the jury, in accordance with his proposed instruction, that the inference need not be drawn. This Court held that use of the word "may" conveyed "precisely the same meaning" as his proposed instruction. In *McKinney*, the judge did not refer to the inference as "rebuttable," as he did in this case. That terminology, like the word "may," conveys the idea that the inference need not be drawn by the jury.

The appellant also asked the judge to strike the instruction about no presumption arising below .05% because it left the jury in the dark about the blood alcohol levels of .06% through .09%. The appellant's blood alcohol level was .08% almost two hours after the accident.

In support of his proposed jury instruction, the appellant relied on the case of *State v. Bruce Hodge*, Tennessee Criminal Appeals, opinion filed at Jackson, April 24, 1985, wherein this Court held that a blood alcohol level of .10% or more creates a rebuttable inference of intoxication and that anything less than .10% creates no inference.

The toxicologist testified that based upon a blood alcohol level of .08% almost two hours after the incident, that the appellant's blood alcohol level at the time of the incident was between .13% and .08%. By his own admission the appellant drank three beers shortly before the incident and virtually all of the witnesses who encountered the appellant on the night of the crimes believed him to be intoxicated. They based their opinions upon the smell of alcohol on his breath, his slurred speech and his reckless and belligerent manner.

 There was ample, indeed overwhelming, evidence—totally apart from the inference—from which the jury could find that the appellant was under the influence of an intoxicant at the time of the accident. Indeed, he has not even challenged the sufficiency of the convicting evidence in this appeal. This issue has no merit.

In the final issues the appellant questions the propriety of his sentences. He first contends that the trial judge abused his discretion in sentencing him to the maximum sentence for each homicide.

Since sentencing issues have been raised in this appeal, we have conducted the *de novo* review on the record mandated by § 31 of the Tennessee Comprehensive Correction Improvement Act of 1985, Chap. 5, Public Acts of 1985, First Extraordinary Session, now codified at TCA § 40–35–402(d). In so doing, we have indulged in no presumption that the sentencing decisions of the trial judge were proper.

 The punishment for vehicular homicide as a result of the driver's intoxication is fixed at not less than one nor more than twenty-one years. TCA § 39–2–232. The appellant was a Range II offender, since he was on probation at the time of these offenses. TCA § 40–35–107(3)(C). Therefore, the minimum sentence to which he could be sentenced was eleven years in the state penitentiary and the maximum was twenty-one years. TCA § 40–35–109(b). In arriving at a determinate sentence within the permissible range the trial judge must apply the sentencing considerations set forth in TCA § 40–35–103, the evidentiary requirements of TCA § 40–35–210(b), the relevant enhancement factors set forth in TCA § 40–35–111, and relevant mitigating factors found in TCA § 40–35–110. There is no set formula by which these factors are to be mechanically applied. Rather, sentencing is to be approached on a case by case basis. *State v. Moss*, 727 S.W.2d 229, 235 (Tenn.1986).

The trial judge found no mitigating factors. From our review of the record, we have also been unable to find any.

On the other hand, the trial judge found six enhancement factors. First, the appellant had a previous history of criminal con-

victions and behavior. TCA § 40–35–111(1). At the time of the offense the appellant was on probation from a conviction for possession of marijuana.

█ As an additional enhancement factor the trial judge found that the offense involved more than one victim. TCA § 40–35–111(3). This was not a proper enhancement factor, since there were separate convictions for each victim. In other words, the appellant received a separate penitentiary sentence for having killed each victim.

The trial judge also found as an enhancement factor that the victims of the offense were particularly vulnerable because of their ages, one being elderly and the other very young. TCA § 40–35–111(4). One witness recounted that Dr. Neuenschwander apparently saw the appellant's truck coming and bent down to get his granddaughter to attempt to run. Perhaps a more virile victim could have successfully extricated himself and the child from the danger zone during the split second that was available.

█ The trial judge also found as an enhancement factor that the personal injuries inflicted upon the victims were particularly great, in that both died. TCA § 40–35–111(6). This is not a proper enhancement factor, since the death of the victim is an element of the offense of vehicular homicide. *State v. Pride*, 667 S.W.2d 102, 106 (Tenn.Cr.App.1983).

Finally, the trial judge found that, from the reckless manner in which the appellant drove his truck through a heavy congested area, it is apparent that he had "no hesitation about committing a crime when the risk to human life was high." TCA § 40–35–111(10). This was clearly a proper factor. The appellant, in a fit of temper, damaged three other vehicles, almost hit a police officer who was directing traffic, and was fleeing at a high rate of speed from a police car with blue lights flashing. All of this took place at a time when, the appellant himself admitted, the streets of Knoxville around the University of Tennessee were clogged with automobiles and pedestrians. His conduct was such that no other

conclusion could be reached about him. He had *absolutely no hesitation* about committing a crime involving *extremely high risk to human life.*

The appellant's sentence of the maximum of twenty-one years for each count was entirely appropriate in light of the proper enhancement factors present in this case.

Finally, the appellant has questioned whether the trial judge erred by ordering the sentences to be served consecutively.

█ Consecutive sentencing is reserved for five classifications of offenders: (1) the persistent offender, (2) the professional criminal, (3) the multiple offender, (4) the dangerous, mentally abnormal offender, and (5) the dangerous offender. Our Supreme Court has defined each class of offender. *Gray v. State*, 538 S.W.2d 391, 393 (Tenn.1976). The trial judge found that the appellant is a "dangerous offender." A defendant may be classified as a "dangerous offender" "if the crimes for which he is convicted indicate that he has little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Not all defendants convicted of several counts of dangerous offenses should be consecutively sentenced. The decision to impose consecutive sentences in cases involving crimes that are inherently dangerous should be based on aggravating circumstances and not merely on the fact that two or more dangerous crimes were committed. *Id.*

The appellant points to other vehicular homicide cases where consecutive sentences were received and seeks to distinguish them. In *State v. Hensley*, 656 S.W.2d 410, 414–415 (Tenn.Cr.App.1983), the appellant was convicted of vehicular homicide and aggravated assault. He received consecutive sentences as a dangerous offender. The appellant noted that in that case the defendant received a lesser sentence than he did and that Hensley had driven his vehicle over a wide area while intoxicated, endangering several people over a period of several hours and that after the accident he fled and concocted a cover up scheme.

In this case, the appellant drove a much shorter distance before tragedy struck, but he endangered many lives during his jaunt. Like Hensley, he fled, leaving injured and dying people in the road, making no effort to assist them. Through the combined efforts of the police and civic-minded citizens his escape was thwarted. Since these crimes and before trial, the appellant was apprehended for speeding and driving on a revoked license. He entered a plea of guilty to the speeding charge.

The appellant also sought to distinguish *State v. Hall*, 675 S.W.2d 208, 211 (Tenn. Cr.App.1984), in which the defendant received consecutive sentences of seven and one-half years each for two vehicular homicides after being found to be a dangerous offender. The only distinction that the appellant finds between his case and that case is that he received a much longer penitentiary sentence for each offense than Hall did for his offenses. The defendant's prior record is not recorded in the opinion in *Hall*. The appellant had a long history of irresponsible criminal behavior, resulting in numerous misdemeanor convictions. It is impossible to equate his sentence to Hall's. Indeed, it would be inappropriate to attempt to do so. *State v. Moss*, supra.

■ In this case the evidence is clear that the appellant is a dangerous offender. In addition to all of the evidence of his dangerousness already set forth, he admitted that by being out late at night and drinking he was in violation of his probation. Earlier, he had obtained his probation officer's permission to travel to Corryton from Blount County that night to visit his mother. Instead, he chose to visit a honky tonk in Knoxville. All of his actions were wild and reckless and it was only by the grace of God that he did not cause more carnage than he did. Like the defendant in *Hall*, he fled after the wreck and exhibited absolutely no concern for the victims he left dying in the street. Consecutive sentencing was entirely appropriate for this dangerous offender and the issue has no merit.

Finding no merit to any of the issues, the judgment is affirmed.

DWYER and CORNELIUS, JJ., concur.