IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

JANUARY 1995 SESSION


| | | |
|---|---|---|
| STATE OF TENNESSEE, | * | C.C.A.# 01C01-9406-CC-00204 |
| APPELLEE, | * | DICKSON COUNTY |
| VS. | * | Hon. Leonard Martin, Judge |
| PAUL GALBREATH, | * | (Voluntary Manslaughter) |
| APPELLANT. | * | |

FILED

September 1, 1995

Cecil Crowson, Jr.
Appellate Court Clerk

For the Appellant:

Shipp R. Weems
District Public Defender

Carey J. Thompson
Ass't Dist. Public Defender
P.O. Box 160
Charlotte, TN  37036

For the Appellee:

Charles W. Burson
Attorney General and Reporter

Clinton J. Morgan
Counsel for the State
450 James Robertson Parkway
Nashville, TN  37243-0493

Robert Wilson
Ass't District Attorney
P.O. Box 580
Charlotte, TN 37036


OPINION FILED: _____



AFFIRMED, SENTENCE MODIFIED



Gary R. Wade, Judge

## OPINION

The defendant, Paul Galbreath, indicted for second degree murder, was convicted of voluntary manslaughter. The trial court imposed a Range I sentence of six years.

In this appeal, the defendant challenges the sufficiency of the evidence and presents the following issues for our review:

> (1) whether the trial court erred by allowing the admission of certain photographs into evidence; and
>
> (2) whether the sentence was excessive.

We affirm the judgment; the sentence is modified to five years.

On March 13, 1993, the defendant shot and killed the victim, Randall Dailey, Jr. The two had been friends for sometime and on the day of the shooting had spent most of the day together looking for automotive parts. Afterwards, the two men returned to the victim's residence, which he shared with Pam Lemoine, a cousin to the defendant. Later in the evening, the victim became angry when he thought the defendant had "messed with" his .357 Magnum and pointed a rifle at the defendant's head. Thereafter, the disagreement escalated and the defendant threatened to kill the victim. Sometime even later, the two men walked outside. A shot was fired and the victim fell. Ms. Lemoine called 911, but rescue personnel were unable to save the victim.

At trial, Ms. Lemoine testified that she and her two

children from a prior marriage had just moved into the house they intended to share with the victim.  The defendant and his friend, Butch Winters, had helped with the move.  On the day of the murder, Ms. Lemoine had picked up the victim's two daughters, who planned to spend the night.  Winters was also present.  Although the evening was very cold, the group grilled pork chops outdoors because the gas line for their stove had not been connected.  The men were drinking, but Ms. Lemoine testified that she did not believe any of them were drunk.  Late in the evening, the victim noticed that his .357 was not in its holster, which had been hung on the wall.  He retrieved his .22 caliber rifle, pointed it at the defendant, and warned that "nobody messed with his guns."  Although the defendant did not have the .357 in his hands, it lay on a shelf in front of his chair.  As the victim walked to his bedroom, the defendant promptly returned the gun to its holster.

Ms. Lemoine testified that she was not alarmed because the victim and the defendant had playfully pointed guns at each other on prior occasions.  She became concerned, however, when the victim admitted that he had been angry with the defendant and felt badly about pointing the gun.  Ms. Lemoine described the victim, who had a severe headache, as crying and "very emotional."  When she gave the victim prescription headache medicine, he complained that two pills were not enough and angrily knocked the bottle out of her hand when she refused to give him more.  The children were apparently upsetting the victim.  Ms. Lemoine's son, who was

3

crying, had hurt himself and the victim's two daughters had apparently changed their minds about spending the night. Ms. Lemoine testified that she loaded the children into the car, realized that she did not have her keys, and went back to the residence. Upon her return, the victim, again angry, told her that he had changed his mind and decided that the children should eat before they left.

After she had finished cooking, Ms. Lemoine went back into the bedroom to talk to the victim, who said he wanted to talk to the defendant. Ms. Lemoine testified that the defendant, who appeared to be holding something behind his back, entered the bedroom. She heard the victim apologize for pointing the gun and the defendant reply, "I could kill you." The victim then said to go ahead that he had wanted to die earlier that day anyway.

Ms. Lemoine next saw the defendant and victim together as she looked out to the deck through the sliding glass door. She saw the defendant point a gun at the victim, who had his head down, heard a shot, and then saw the victim fall. When she went outside, the defendant claimed that the victim had just been "nicked." Ms. Lemoine observed, however, that the victim was seriously injured and called 911.

At that point, the defendant went back inside, sat quietly at the bar, and directed Winters to take his pistol to his truck and leave. The truck did not start, however, and Winters returned to the residence. The defendant then placed

his gun on the bar and said, "there wasn't nothing to do now but wait."

Heather Dailey, the victim's oldest daughter, remembered that her father had a severe headache on the day of the shooting.  She saw the victim point his gun at the defendant and sensed that the victim was angry.  She did not realize her father had been shot until so informed by Ms. Lemoine.

Winters testified that he had been out drinking with the victim and the defendant on the day of the murder.  During the course of the afternoon, there had been some discussion between the defendant and the victim about the victim pointing a gun at Winters, but Winters stated that their conversation was not tense.  However, upon returning to the residence, the victim became agitated and pointed his .357 Magnum at Winters, who covered his head and retreated into the hallway without further incident.  Winters also observed the victim hit and kick a punching bag so viciously as to cause the victim's younger daughter to cry.  Thereafter, when the victim had left for his bedroom, Winters asked the defendant to unload the .357 before the victim aimed it at someone else.  The victim, however, returned before the defendant could do so and angrily pointed his rifle at the defendant when he noticed that the .357 had been removed from its holster.

Later, Winters went to the truck and got the defendant's gun.  He then went into the bedroom where the

children were watching television.  At that point, Winters walked out of the bedroom and overheard the victim "hollering" at the defendant, saying "I'll kill you or you kill me." Winters saw the victim with his arms in the air and heard a shot fired.  As the defendant came back inside, Winters checked on the victim and asked Ms. Lemoine to call 911.

After the shooting, Winters, who explained that he had been drinking heavily throughout the evening, had told officers that the victim and Ms. Lemoine had engaged in a terrible fight, with the victim swearing and making threats. He informed the investigating officers that the victim had wanted to do some target shooting and yelled, "I'll kill you," just before he was shot.

Charles Seay, Jr., with the Dickson County Ambulance Service, arrived to find the victim lying on a walkway attached to the deck.  He was not breathing, but was briefly revived.  Seay observed a large knife or machete to the right of the victim's head.

Donald Shirley, a Dickson County Sheriff's Department officer, helped emergency personnel tend to the victim.  He then placed the defendant in his police car, read him his rights, and eventually transported him to the police station.

Officers John Bowlerjack and Debbie Jones Bowlerjack, also with the Dickson County Sheriff's Department,

secured the inside of the residence until detectives arrived. John Bowlerjack spoke with the defendant first, describing his attitude as "nonchalant." The defendant told him that he and the victim had been target shooting and that, just as he pulled the trigger, the victim jumped into the path of the bullet. Winters also spoke briefly with John Bowlerjack, corroborating the defendant's claim that he and the victim were target shooting, but adding that the two men had been arguing. The two officers then found several guns in the residence and a long knife hanging on the wall behind the bar.

Dickson County Detectives Randy Starkey and Wayne Heflin took two statements from the defendant. In those statements, the defendant claimed that the victim had never appeared angry during the course of the day, had asked him to target shoot outside, and had jumped into the pathway of the first shot. The defendant could not explain the actions of the victim and did not know why the machete was on the deck.

Robert Daniel Royce, a TBI forensic examiner, confirmed that a .44 Remington Magnum belonging to the defendant had fired the fatal shot. He determined that the weapon was one of the loudest and most powerful available.

Dr. Charles Harlan, Chief Medical Examiner for the State of Tennessee, performed the autopsy. He found that a "tight contact gunshot wound" to the forehead caused the victim's death. It was his opinion that the gun had been pressed against the victim's skull at the time the shot was

fired.  The victim had a .15 percent blood alcohol level.


On appeal, the state is entitled to the strongest legitimate view of the evidence and all inferences which might be drawn therefrom.  State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).  The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted exclusively to the jury as triers of fact.  Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978).  When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983), cert. denied, 465 U.S. 1073 (1984); Tenn. R. App. P. 13(e).


Although the state claims the sufficiency issue has been waived on procedural grounds, we chose to address the merits of the claim.  Voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner."  Tenn. Code Ann. § 39-13-211(a).


Here, the defendant admitted that he fired the shot that killed the victim.  While he claimed that the shooting was accidental, there was evidence that he and the victim had

8

exchanged heated words and that the victim had angrily pointed a gun at the defendant just a short while before the shooting. Medical evidence suggested that the defendant's gun was pressed against the victim's head when fired.

These were contested facts. Under such circumstances, it is the prerogative of the jury to determine whether the shooting was purposeful or accidental. Clearly, there was sufficient evidence to establish each of the elements of voluntary manslaughter.

I

Next, the defendant contends that the trial court erred by admitting autopsy photos of the victim, depicting the gunshot wound to his head. He claims that the graphic nature of the photographs was so prejudicial as to outweigh their probative value.

The admission of photographs is governed by Tennessee Rule of Evidence 403. See State v. Banks, 564 S.W.2d 947 (Tenn. 1978). To be admissible, the evidence must be relevant and its probative value must outweigh any prejudicial effect. Tenn. R. Evid. 403; State v. Banks, 564 S.W.2d at 950-51. Whether to admit the photographs is within the discretionary authority of the trial court; its ruling will not be reversed absent a clear showing of an abuse. State v. Allen, 692 S.W.2d 651 (Tenn. Crim. App. 1985).

Here, the photographs were especially probative in

light of the defendant's claim that the shooting was accidental. Two eyewitnesses testified that the two men were several feet apart immediately before the fatal shot. Dr. Harlan's autopsy led him to conclude that the gun was held directly to the victim's head when fired. Thus, the place and nature of the gunshot wound were highly probative of guilt. Moreover, the photographs were not particularly gruesome. While the entry wound was visible, the forehead remained intact and very little blood could be seen. In short, we find that the trial court properly admitted these photographs into evidence.

## II

The defendant also insists that the trial court erred by imposing the maximum possible sentence of six years and argues that it should have suspended the entire sentence. He submits that neither of the two enhancement factors applied by the court were applicable and complains that mitigating factors were given insufficient weight.

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a <u>de novo</u> review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." <u>State v. Ashby</u>, 823 S.W.2d 166, 169 (Tenn. 1991). The Sentencing Commission Comments provide that

the burden is on the defendant to show the impropriety of the sentence.

Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, and -210; State v. Smith, 735 S.W.2d 859, 862 (Tenn. Crim. App. 1987).

The defendant argues that Tenn. Code Ann. § 40-35-114(9), the employment of a firearm during the commission of the crime, cannot be used to enhance his sentence because it is an element of the offense of voluntary manslaughter. This argument was rejected, however, in State v. David Keith Daugherty, No. 03C01-9203-CR-00082 (Tenn. Crim. App. at Knoxville, August 27, 1993), which specifically held that the use of a firearm was not an essential element of manslaughter. Consequently, this factor was properly applied.

The defendant also disputes the applicability of Tenn. Code Ann. § 40-35-114(16), that the potential for injury to the victim was particularly great. We agree. In Daugherty, this court held that the factor was an element of any homicide case and, therefore, could not be considered to

11

enhance a sentence.

The state argues that Tenn. Code Ann. § 40-35-114(10), that the defendant had no hesitation about committing a crime when the risk to human life was high, should have been applied as an enhancement factor by the trial court. It bases its claim, for the most part, on the powerful nature of the defendant's weapon. In State v. Lambert, 741 S.W.2d 127, 134 (Tenn. Crim. App. 1987), however, this court determined that this factor was also inherent in any homicide and could not be used to enhance the defendant's sentence.

The trial court afforded the defendant some mitigation because this crime was committed "under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated his conduct." Tenn. Code Ann. § 40-35-113(11). It refused, however, to apply Tenn. Code Ann. § 40-35-113(2), that "the defendant acted under strong provocation." We do not disagree with either conclusion.

The defendant was charged with second degree murder. His conviction of the lesser included offense of voluntary manslaughter was apparently based upon the jury's conclusion that he acted under "adequate provocation." The defendant claims that the jury verdict warrants application of the "strong provocation" mitigating factor. See Tenn. Code Ann. § 40-35-113(2). There is no prohibition against trial courts giving a defendant "double credit" in these circumstances.

12

Yet, this court has previously ruled that the factor need not be automatically applied in voluntary manslaughter cases. See State v. McKinzie Monroe Black, No. 01C01-9401-CC-00006 (Tenn. Crim. App. at Nashville, July 14, 1995). Here, the defendant had been drinking and "playing with guns." These factors contributed to a heated argument, which apparently led the defendant to shoot the victim at point blank range. While the provocation may have been adequate to reduce the degree of the defendant's culpability, the nature and the circumstances of this crime do not necessarily demonstrate the kind of "strong provocation" required to mitigate the sentence. We, therefore, defer to the finding made by the trial court.

As a standard Range I offender, the defendant was eligible for a sentence ranging between three and six years. Tenn. Code Ann. § 40-35-112(a)(3). The trial court properly applied one enhancement and one mitigating factor, but improperly applied a second enhancement factor. That the defendant employed a firearm in the commission of the crime carries particularly great weight. Alcohol and firearms are a particularly dangerous combination. That the defendant handled a firearm in the presence of four children is also a concern. The enhancement factor justifies a sentence above the minimum, but not the absolute maximum. From our de novo review of the record and application of the appropriate mitigating and enhancing factors, we conclude that a sentence of five years is warranted. The length of the sentence is so modified.

Among the factors determinative on the issue of probation are the circumstances of the offense, the defendant's criminal record, social history, present condition, his potential for rehabilitation or treatment, and the deterrent effect upon and best interest of the defendant and the public. State v. Grear, 568 S.W.2d 285 (Tenn. 1978); Stiller v. State, 516 S.W.2d 617, 619-20 (Tenn. 1974). Especially mitigated or standard offenders convicted of Class C, D, or E felonies are presumed to be favorable candidates "for alternative sentencing options in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6). With certain statutory exceptions, none of which apply here, probation must be automatically considered by the trial court if the sentence imposed is eight years or less. Tenn. Code Ann. § 40-35-303(a). The ultimate burden of establishing suitability for probation, however, is still upon the defendant. Tenn. Code Ann. § 40-35-303(b).

Alternative sentencing issues must be determined by the facts and circumstances of the individual case. State v. Moss, 727 S.W.2d 229 (Tenn. 1986). "[E]ach case must be bottomed upon its own facts." State v. Taylor, 744 S.W.2d 919, 922 (Tenn. Crim. App. 1987).

The defendant, who lives with his mother, has no significant prior criminal history and works sporadically as an auto mechanic. His ability to work is limited by a crippling injury he sustained to his left arm in a motorcycle accident. Those factors weigh in favor of a grant of

14

probation.  The death of the victim, however, has traditionally required a showing of exceptional circumstances to warrant probation.  State v. Blackwood, 713 S.W.2d 677, 682 (Tenn. Crim. App. 1986).  While the fact that a life was taken, standing alone, is no longer an adequate basis for denying probation, see State v. McKinzie Monroe Black, No. 01C01-9401-CC-00006 (Tenn. Crim. App. at Nashville, July 14, 1995), the nature and circumstances of this offense, among other things, warrants the denial of probation.  The defendant's social history is not entirely positive.  At thirty-eight, the defendant should have had the maturity to appreciate the foolishness of his conduct on the night of the shooting.  His disregard for the safety of others was blatant and his casual attitude toward the use of a weapon was inexcusable.  The grant of probation would clearly depreciate the seriousness of the offense.

The conviction is affirmed.  The sentence is modified to five years.

_____
Gary R. Wade, Judge

CONCUR:


_____
David H. Welles, Judge



_____
William S. Russell, Special Judge

15