# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
February 5, 2013 Session

## STATE OF TENNESSEE v. JOHN BLAND

**Appeal from the Criminal Court for Shelby County**
**No. 10-01710    James C. Beasley, Jr., Judge**

---

**No. W2012-00257-CCA-R3-CD  -  Filed March 25, 2013**

---

After a trial by jury, the defendant was convicted of aggravated assault, a Class C felony, and carrying a handgun as a felon, a Class E felony.  The defendant was sentenced as a Range III, persistent offender to twelve years for the aggravated assault and to a consecutive term of six years as a career offender for carrying the handgun as a felon.  On appeal, the defendant claims that the evidence is insufficient to support his convictions and that the trial court erred by ordering him to serve his sentences consecutively.  For the reasons that follow, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Stephen Bush, District Public Defender; Tony N. Drayton (on appeal) and Lawrence Russell White (at trial), Assistant Public Defenders; for the appellant, John Bland.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Pamela Flemming, Assistant District Attorney General; for the appellee, State of Tennessee.

## OPINION

### FACTS AND PROCEDURAL HISTORY

On March 9, 2010, a Shelby County grand jury returned an indictment charging the defendant with one count of especially aggravated robbery in violation of Tennessee Code Annotated section 39-13-403, one count of carjacking in violation of Tennessee Code

Annotated section 39-13-404, one count of employing a firearm during the commission of a felony in violation of Tennessee Code Annotated section 39-17-1324(i)(1), and one count of carrying a handgun as a felon in violation of Tennessee Code Annotated section 39-17-1307. The charges against the defendant stemmed from his conduct on September 9, 2009, when—under circumstances that were hotly contested—he shot the victim in the leg outside of a local S-Mart (formerly known as "Tong's grocery"). At the defendant's trial on July 12-14, 2011, the following evidence was presented:

The victim, Travis Banks, testified that around 10:00 p.m. on the evening of September 9, 2009, he had just finished getting his hair cut and had driven to "Tong's" in his 2000 Nissan Maxima to purchase some cigarettes. He left the keys in his car and his engine running when he went inside, as was his usual practice. He testified that as he left the store with his cigarettes, the defendant approached him carrying a handgun.

The victim testified that he was well acquainted with the defendant, whom he identified in open court, and he was certain that it was the defendant who had approached him on the day in question. The victim testified that he knew the defendant both because they had served time together at a penal farm and because he and the defendant had seen each other around the neighborhood. He testified that the defendant had washed his car in the past. He also testified that he had seen the defendant at his mother's house on several occasions and that his mother had given the defendant food to eat.

The victim testified that when the defendant approached him at "Tong's," the defendant told him to "[d]rop it off, bitch," which the victim understood to mean that he was being robbed. The victim testified that the defendant had a revolver in his right hand, which he was pointing at the victim as he spoke. The victim testified that he was carrying money on his person in two different pockets of his clothes that day, and he gave the defendant the smaller amount of the two amounts, which he estimated was $137.00. He testified that after he gave the defendant the money, he tried to "duck" back into the store, but the defendant fired three shots—hitting him once in the leg—before he was able to do so. Once inside, the victim shut the door to the store and held it closed. The victim testified that the defendant was outside the door and beat on the door with his gun in an effort to get inside. Eventually, the defendant gave up, got into the victim's car, and drove off.

The victim testified that the store owner called the police, and he told them what had transpired when they arrived. His leg was bleeding badly. He was transported to the hospital by ambulance and stayed there for approximately two weeks. The victim testified that he underwent open knee surgery, and he was stitched and stapled up. He testified that his knee bone was broken, causing the doctors to put a "plate" inside of it. He testified that the bullet wound to his leg was still visible, and he showed the wound to the jury. The victim also

testified that his car was never returned to him. The victim testified that on the day he was released from the hospital, he learned that his car had been burned up, and the remains were located at a police impound yard.

The victim testified that during the police investigation, he told the investigating officers the identity of the man who had robbed and shot him, and he picked the defendant's picture out of a photographic array. While on the stand, the victim authenticated a copy of the array, which was entered into evidence.

The victim testified that after the defendant's picture was displayed on the news, the defendant called him and asked him "what can he do for me to drop the charges off him." He testified that he recorded this conversation, and a copy of the conversation was played for the jury. The victim testified that he told the defendant that there was nothing the defendant could do to convince him to drop the charges, because the defendant had shot him and burned up his car. The victim testified that the defendant replied that he had not burned the victim's car. The defendant claimed that he had left the victim's car at "Michelle Pebbles."

Before concluding his testimony, the victim testified that he had been convicted in 2008 of possession of marihuana with intent to sell, and again in 2010 of possession of marihuana with intent to sell as well as being in possession of a firearm. The victim testified that he was not carrying a gun on the day that he was attacked, but if he had been, he would probably have defended himself.

On cross-examination, the victim denied ever selling marihuana to the defendant. The victim testified that when the defendant shot at him, none of the bullets hit the store because he had not yet made it inside of the store when the shots were fired. The victim testified that the door to the store opened outward, and when he was inside, he held the door shut by holding onto the end and pulling backward. He testified that he weighed more than the defendant, and he also had a larger door handle against which to brace himself. He testified that he did not know why the defendant did not shoot him through the door, but he speculated that the defendant may have been running low on bullets.

The victim first admitted, and then later denied, that he had threatened the defendant's life after the shooting. He admitted that he had told the defendant "if I wanted you dead, you'd be dead." He acknowledged that during his phone conversation with the defendant following the shooting, he stated "you shot me over 70 bucks," even though he had previously testified both at trial and during a preliminary hearing that he had given the defendant $137.00 during the robbery. The victim denied that the discrepancy was due to the fact that he and an individual named "Mr. Bilbo" had recently conned the defendant out of $70.00. The victim also denied that he had pulled a gun on the defendant earlier on the

day of the shooting, at the location where he had been getting his hair cut.

Mr. Sadalaik Aldafari testified that he was employed by S-Mart and was working at a location on Ford Road in Shelby County, Tennessee, on September 9, 2009. He testified that on that evening a shooting occurred at that location. He testified that he heard two or three shots, and then he saw the victim come inside the store and hold onto the door. Mr. Aldafari testified that the victim told him that he had been shot. He saw blood, and eventually the victim fell down. He testified that he called the police, and they arrived shortly afterward.

On cross-examination, Mr. Aldafari testified that the door to the store was made of plexiglass, and the store had on its outside lights. He testified that he would have been able to see someone who was standing against the store's door and banging on it, but he saw no one doing so on the evening in question. He testified that the victim held the door closed for about three of four minutes before he fell over. On re-direct examination, Mr. Aldafari testified that when the shooting started he ran and hid behind some chips, and he could not see outside the store's door from that position. On re-cross examination, Mr. Aldafari testified that there were no bullet holes in his store after the event.

Detective Steven Lovelace, a Germantown police officer assigned to the Safe Streets Task Force, testified that the task force investigates robberies and carjackings in the Western District of Tennessee, including Shelby County. Detective Lovelace testified that he investigated the robbery and shooting of the victim and that during his investigation, he visited the victim in the hospital, where he observed that the victim had a gunshot wound to his right knee. After interviewing the victim, Detective Lovelace showed him a photographic array, and the victim identified the defendant from that array as the individual who shot him.

Sergeant James Taylor, a Memphis Police Officer also assigned to the Safe Streets Task Force, testified that he visited the victim in his home following the shooting and observed him in a leg brace. He testified that he made a copy of a recording of a telephone conversation between the victim and the defendant that he found on the victim's cell phone.

Ms. Tracy Hardy testified that she was a fingerprint technician with the Shelby County Sheriff's Department. She testified that she was responsible for verifying all of the prints of individuals who were arrested in Shelby County. She testified that every individual arrested is given a file and a file number associated with their particular fingerprints. She identified the defendant in open court and testified that she took his fingerprints and matched them to a file for "John Bland." She testified that this file reflected that the defendant was arrested for an aggravated robbery in 2004, filed under booking number 04117509.

Ms. Michelle Jones, the keeper of records at the criminal court clerk's office, testified that she had with her certain court records concerning Mr. John Bland. She testified that those records included a judgment sheet reflecting that Mr. John Bland was convicted of aggravated robbery on May 6, 2005.

Following this testimony, the victim's medical records were entered into evidence by stipulation of the parties, and the State rested. The defendant took the stand as the sole witness for the defense. He denied robbing the victim and stealing his car, but he admitted that he carried a gun with him on the day in question.

The defendant testified that on the evening of the shooting, he was heading home after playing some video games at a friend's house when he saw a friend named "Bilbo," who he knew sold marihuana. He asked Bilbo if he could purchase some marihuana, but Bilbo informed him that he did not have any. Bilbo offered to take the defendant to a house where he could purchase some. They went to a house together, and Bilbo went inside while the defendant waited on the porch. Bilbo returned with the victim, who told the defendant that he was also out of marihuana but referred them to another house located on King street.

The defendant testified that he and Bilbo traveled to the house on King street. He testified that Bilbo told him that he could not come inside of the house because the sellers did not know him. The defendant testified that he gave some money to Bilbo and waited outside. Several minutes later, he noticed the victim's car drive around the street to a store, and then come back around.

The defendant testified that he knocked on the door to the house, and "a lady" answered and asked him what he wanted. When he told the lady that he was looking for Bilbo, the lady informed him that Bilbo had just left out of the back door. The defendant concluded that Bilbo had stolen his money.

The defendant testified that he returned to the house where he had spoken with the victim. Having traveled there and back again in search of Bilbo, the defendant knocked on the door. The defendant testified that the victim came out of the house wearing a barber's apron, as if he had been getting his hair cut. The defendant testified that he asked the victim for Bilbo's whereabouts and explained that Bilbo had just absconded with his money. The victim replied that Bilbo did not stay at that house. The defendant testified that he asked the victim to tell Bilbo whenever he saw him that he (the defendant) was "going to do something to him about his money." In response, the victim pulled out a gun from under his apron and said that if the defendant "was going to do something to him, [he] better make sure [he] got the right mother fucker." The defendant testified that when he heard this, he decided that the victim had also been involved in the scam.

The defendant testified that he left because the victim "had his gun all the way drawn and [his] was [still] on [his] hip." He went to the general vicinity of the "store," which was about a ten minute walk away. As he arrived at the store, the victim drove up in his Nissan Maxima. He saw the victim go into the store, and he walked over to the store as well. He said to the victim, "Brother, let me holler at you." The victim told him to talk to him outside. The defendant waited until the victim came outside, and then told the victim, "damn, Brother, that was petty of you-all pulled a move on me about my little money." The victim denied his involvement but then told the victim, "well, you feel like I did something wrong to you then you know take care of your business." The defendant testified that he pulled out his gun and shot the victim in the leg as the victim ran inside the store yelling for someone to call the police. The defendant testified that he never banged on the door of the store in an effort to reach the victim.

The defendant testified that another individual, whom he had seen before and knew to be in the victim's gang, was standing near the store. This individual fired a single shot at him. In response, the defendant jumped in "the car" and drove off. The defendant testified that the car was running and that its door was open when he jumped inside. He testified that he left the car at "Mitchell and Weaver."[1] The defendant testified that he left the car in this location because he assumed that someone who knew the victim or some member of the victim's family would see his car and return it to him. The defendant specifically denied setting the victim's car on fire. The defendant testified that he did not initially turn himself in to the police after the crime because he was afraid for his family's safety. However, when he decided that the victim was not going to retaliate, he eventually turned himself in.

On cross-examination, the defendant admitted that he knew that he was not supposed to have a firearm, but he nonetheless had been carrying one for about two months prior to the incident. The defendant testified that he shot the victim in the leg "[b]ecause I ain't really just want to hurt him. I just wanted him to know that I wasn't playing." The defendant testified that he knew who had set fire to the victim's car after the incident, and this individual went by the name "Frog."[2] The defendant testified that one of Frog's friends had told him that "Frog" had stolen certain items out of the victim's car and then burned it up to destroy the evidence.

The defendant also admitted under cross-examination that he was the same "John Bland" who had been convicted of aggravated robbery under indictment 04-0144, another

---

[1] We assume that the varying references to "Mitchell and Weaver" and "Michelle Peebles" in the record refer to the same location.

[2] Possibly "Smaug?"

aggravated robbery under indictment 04-08145, yet another aggravated robbery under indictment 04-08146, and an aggravated burglary under indictment 00-14722. On re-direct examination, the defendant denied that he fired two additional shots at the victim after shooting him in the knee. He also testified that he only took the victim's car because he was afraid for his life.

Following this testimony, the defense rested and court adjourned for the day. The following morning, the jury was instructed and retired to deliberate at 10:45 a.m. The jury returned with a verdict at 4:00 p.m., finding the defendant not guilty of especially aggravated robbery but guilty of the lesser included offense of aggravated assault with respect to Count 1 of the indictment and guilty of carrying a handgun as a felon as charged in Count 4 of the indictment. With respect to Count 2 of the indictment, the jury found the defendant not guilty of carjacking but deadlocked on the lesser included offense of theft. The jury also could not reach a decision with respect to the defendant's employment of a firearm during the commission of a felony as charged in Count 3 of the indictment.

At a sentencing hearing on November 3, 2011, the trial court sentenced the defendant to twelve years for the aggravated assault and to a consecutive six years for carrying a handgun as a felon, for a total effective sentence of eighteen years. The defendant filed a motion for new trial that same day, which was denied by the trial court following a hearing on January 3, 2012. A timely notice of appeal was filed. We proceed to consider the defendant's claims.

## ANALYSIS

The defendant claims that the evidence is insufficient to support his convictions and that the trial court erred by ordering him to serve his sentences consecutively. For the reasons that follow, we find these claims to be without merit and affirm the judgments of the trial court.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant claims that the evidence is insufficient to support his convictions for aggravated robbery and carrying a handgun as a felon. "When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Dorantes*, 331 S.W.3d 370, 379 (2011); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "Because a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, on appeal a defendant bears the burden of showing why the evidence is insufficient to support the

conviction." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012). The State must be afforded the strongest legitimate view of the evidence and all of the reasonable inferences that may be drawn from it. *See id*. The jury as the finder of fact is responsible for assessing the credibility of the witnesses, deciding what weight to accord their testimony, and reconciling any conflicts in the proof. *See id.* On appeal, we cannot re-weigh the evidence or draw any inferences from it other than those drawn by the jury. *See id.*

The defendant in this case was convicted of aggravated assault and carrying a handgun as a felon. "A person commits aggravated assault who . . . [i]ntentionally or knowingly commits an assault . . . and . . . [c]auses serious bodily injury to another [or] [u]ses or displays a deadly weapon. . . ." T.C.A. § 39-13-102 (a) (1) (2009). "A person commits assault who . . . [i]ntentionally, knowingly or recklessly causes bodily injury to another [or] [i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury. . . ." T.C.A. § 39-13-101(a). The possession of firearms by convicted felons has been prohibited by, *inter alia*, Tennessee Code Annotated 39-17-1307(c)(1), which provides that: "A person commits an offense who possesses a handgun and has been convicted of a felony."

In this case, all of the evidence necessary to support each of the essential elements of both crimes of which the defendant stands convicted was actually contained in his own testimony. The defendant testified that on the date in question he shot the victim in the leg with a gun he was carrying because he believed that the victim had cheated him out of money during a drug transaction. This testimony suffices to support the defendant's conviction for aggravated assault. The defendant also testified that he had been convicted of several aggravated robberies prior to the day of the shooting. This additional testimony suffices to support the defendant's conviction for carrying a handgun as a felon.

Although rendered superfluous by the defendant's own testimony, we note that the record also contains ample other evidence that might convince a reasonable jury of the defendant's guilt beyond a reasonable doubt. The victim testified that he knew the defendant, that he recognized the defendant as the defendant was approaching him with a gun drawn on the day in question, and that soon thereafter the defendant robbed and shot him. A store employee testified that he heard gunshots and saw the victim enter his store bleeding shortly afterward. Law enforcement witnesses testified that the victim identified the defendant as his shooter from a photographic array. Collectively, this evidence supports all of the essential elements of aggravated assault. Two additional state witnesses testified that the defendant had at least one prior felony conviction. Combined with the testimony from the victim to the effect that the victim approached him with a handgun drawn, this evidence supports all of the essential elements of being a felon in possession of a handgun.

As we have discussed, when reviewing the sufficiency of the evidence, this court may

not re-weigh evidence or resolve conflicts in the evidence in a manner different than the jury. *See Wagner*, 382 S.W.3d at 297. However, in this case, with respect to all of the essential elements of the only two crimes of which the defendant was actually convicted, there simply was no conflict in the evidence presented at trial. All of the witnesses that testified on the relevant subjects agreed that the petitioner committed conduct that satisfies the legal definitions of the crimes. The defendant's claim that the evidence is insufficient to support his convictions is denied.

## II. CONSECUTIVE SENTENCES

The defendant contends that the trial court erred by sentencing him to consecutive sentences. A trial court's in-range sentencing decisions are entitled to a presumption of reasonableness and are reviewed under an abuse of discretion standard. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The defendant does not dispute that his sentence of twelve years for committing aggravated assault is within the range permitted for a Range III, persistent offender convicted of committing a Class C felony, *see* T.C.A. § 40-35-112(c), or that his sentence of six years for being a felon in possession of a handgun is his required sentence as a career offender, *see* T.C.A. § 40-35-108(c), as it is the maximum sentence within the range authorized for a Range III, persistent offender convicted of committing a Class E felony, *see* T.C.A. § 40-35-112(c). Consequently, we begin with the presumption that all of the trial court's sentencing decisions, including the decision to order the defendant's sentences to be served consecutively, were reasonable.

The defendant has failed to carry his burden of rebutting this presumption on appeal. The trial court imposed consecutive sentences on the grounds that the defendant was a dangerous offender. *See* T.C.A. § 40-35-115(b)(4) (court may order consecutive sentences if it finds by preponderance of evidence that "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high."). The defendant urges that because the "dangerous offender" category is subjective and difficult to apply, it should only be applied based on the presence of "aggravating circumstances" surrounding the crimes for which the defendant is being sentenced. The defendant cites to *Gray v. State*, 538 S.W.2d 391, 393 (Tenn. 1976), and *State v. Lambert*, 741 S.W.2d 127, 134 (Tenn. Crim. App. 1987), in support of this argument. We have reviewed this precedent to the extent that these cases might be construed as supporting the defendant's argument, they were superseded by *State v. Wilkerson*, 905 S.W.2d 933, 939 (Tenn. 1995), in which the supreme court considered the issue of consecutive sentences based on the "dangerous offender" classification in light of the Criminal Sentencing Reform Act of 1989 and held that "the imposition of consecutive sentences on an offender found to be a dangerous offender requires, in addition to the application of general principles of sentencing, the finding that an extended sentence is

necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed" without making any mention of the need for a finding that any additional aggravating circumstances accompanied the crimes. The trial court expressly stated that it found that both *Wilkerson* factors were satisfied in this case.

Even if the trial court had committed some form of error by considering some irrelevant information alongside the information that the defendant concedes is relevant (the circumstances of the offense) in reaching its determination that the defendant was a dangerous offender, it is now the law that pursuant to *Bise*, "[s]o long as there are . . . reasons [appearing in the record] consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld" on appeal. *Bise*, 380 S.W.3d at 706. Standing alone, the facts concerning the defendant's shooting of the victim on the day in question support a conclusion that the defendant is a dangerous offender who has little regard for human life. By his own testimony, the defendant shot an unarmed man in a public place in a dispute over $70, simply because the man's response upon being confronted was to tell him to do what he needed to do. Based on this testimony alone, this court cannot reach any conclusion other than that the defendant has no meaningful respect for, and no hesitation about committing a crime that risks, human life. The defendant's claim that the trial court erred by ordering him to serve his sentences consecutively is denied.

## CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE