Dana STORY, Plaintiff/Appellee,

v.

LEGION INSURANCE COMPANY,
Defendant/Appellant.

Supreme Court of Tennessee,
Special Workers' Compensation
Appeals Panel,
at Jackson.

Sept. 20, 1999.

Mark P. Barnett, Hill Boren, Jackson, TN, for Appellee.

Lee Anne Murray, and Cynthia DeBula Baines, Feeney & Murray, Nashville, TN, for Appellant.

**MEMBERS OF PANEL:**

Justice JANICE M. HOLDER, and Senior Judge L. T. LAFFERTY, and Special Judge J. STEVEN STAFFORD.

**MEMORANDUM OPINION**

J. STEVEN STAFFORD, Special Judge.

This worker's compensation appeal has been referred to the Special Workers' Compensation Appeals Panel of the Supreme Court in accordance with Tenn. Code Ann. § 50-6-225(e) for hearing and reporting to the Supreme Court of findings of fact and conclusions of law.

 Review of the findings of fact made by the trial court is *de novo* upon the record, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise. Tenn. Code Ann. § 50-6-225(e)(2); *Stone v. City of McMinnville*, 896 S.W.2d 548, 550 (Tenn.1995). The application of this standard requires this Court to weigh in more depth the factual findings and conclusions of the trial court in a worker's compensation case. *See Corcoran v. Foster Auto GMC, Inc.*, 746 S.W.2d 452, 456 (Tenn.1988). However, considerable deference must be given to the trial judge, who has seen and heard witnesses especially where issues of credibility and weight of oral testimony are involved. *Jones v. Hartford Accident & Indem. Co.*, 811 S.W.2d 516, 521 (Tenn.1991).

The defendant asserts that the trial court erred when it found that the plaintiff suffered a 35% permanent partial disability to each arm and submits the following issues for our review:

I. The plaintiff did not suffer an injury as defined by the Tennessee Workers' Compensation Act;

II. The trial court failed to give greater weight to the testimony of the treating physician rather than the evaluating physician; and

III. The plaintiff did not suffer a vocational disability pursuant to the Tennessee Workers' Compensation Act.

For the following reasons, we affirm the judgment of the trial court.

**FACTS**

The plaintiff is a twenty-eight-year-old female. She is a high school graduate who attended college at both Memphis State University and Lambuth University. She subsequently enrolled at Jackson State Community College where she received a nursing degree in 1994.

While attending nursing school, she was employed at the Jackson–Madison County General Hospital. After attaining her nursing degree, she was employed by Workcare Resources. She was subsequently hired as director of professional services at Housecall Home Healthcare. In August 1996, she went to work for the Chester County Nursing Home (hereinaf-

ter known as the "nursing home.") as the assistant director of nursing. Her job required her to assist the director of nursing as needed. Her primary objective was to be the care plan team coordinator with her emphasis being on updating all the care plans for the nursing home patients. Since the plaintiff was the only person with any computer background, she was also required to enter the care plan data into the computer.

The plaintiff testified that the nursing home was at full capacity when she began work and that care plans were required to be prepared for each patient. The care plans were an evaluation of each patient and were required by state guidelines. They were used to verify that the patients needed to be in the nursing home thereby allowing the nursing home to receive payment for their care.

At the time the plaintiff was employed, the nursing home was several months behind on the care plans. The preparation of the care plans was a team effort involving everyone who cared for the patient. This initially resulted in a written report that the plaintiff would subsequently enter into the computer. The plaintiff was the team leader and spent the majority of her time working on the care plans and entering data into the computer.

During the last part of October 1996, the plaintiff began experiencing numbness and tingling in her right hand. This gradually began to occur in both hands. She reported this to her employer the first part of November but did not request to see a physician until the middle of November because she was hopeful that the symptoms would go away. In an effort to alleviate the symptoms, she personally bought splints and began to wear them.

After her condition did not improve, she saw Dr. Lowell Stonecipher in December 1996. At this time, the plaintiff was spending approximately six hours per day writing and entering data into the computer. She testified that once the care plans were caught up, she believed that she would only be required to spend approximately two hours per day on the plans. When she saw Dr. Stonecipher, she did not request to be taken off work because she did not want to get any further behind.

After seeing Dr. Stonecipher the first time, the plaintiff's hands grew worse. Her wrists ached and she had numbness and tingling in her thumb and first two fingers.

The plaintiff returned to see Dr. Stonecipher on January 6, 1997. On her return to work that day, she was informed by the nursing home that her position was being eliminated. At the time of her termination, the care plans were virtually up-to-date.

The plaintiff was off work for a month and then was employed as a medical care manager for Crawford and Company. She was not required to do any computer work in this job. The plaintiff left Crawford and Company in November 1997 and obtained employment with Corvel Corporation in the same capacity.

The plaintiff testified that while working for the nursing home, her strength decreased by approximately 75%. She also testified that the pain in her hands peaked in January 1997 and that it has remained constant since that time. She suffers pain on a daily basis and is very weak. The pain in her hand wakes her up at least once each night. Because of her problem, she is very careful about how she picks things up. Her husband is required to do most of the housework including vacuuming and mopping.

The only time the plaintiff drives is when she is required to do so with her job. She experiences great pain while driving because of the vibration of the steering wheel and the required gripping. In her job, she is sometimes required to drive as far as Memphis. She testified that she has modified her driving technique so that she now drives with her knees on occasion or

drives under handed and alternates her hands.

Before beginning work for the nursing home, the plaintiff was required to take a pre-employment physical. No problems were noted on the physical examination. The plaintiff testified that she had never had any problems with her hands, experienced joint pain or suffered from a serious illness before she began work at the nursing home. She has never been diagnosed with lupus or rheumatoid arthritis. Before her injury, she was able to water ski and rode a jet ski most weekends that the weather permitted. She is now unable to participate in any of these activities.

The plaintiff testified that she would now be unable to work as a staff nurse due to her inability to lift patients. She could not work in a hospital nursery because of her inability to perform repetitive lifting. Because of her inability to lift, she also could not work in the home health field.

Since she left Dr. Stonecipher's care, her condition has not improved.

The plaintiff never took any time off work because of her problems nor did she ever request any time off work. She continued to do her job at the nursing home at all times.

The plaintiff testified that she did not want to miss work because she did not want to become further behind. She stated that no one else could operate the computer and she felt responsible for getting the job done.

Archie Story, the plaintiff's husband, testified that the plaintiff had no physical problems before working at the nursing home. He stated that he is now required to do almost all of the housework and that they have had to change their lifestyle because of the plaintiff's condition. When they buy groceries or cleaning supplies, they must buy smaller sizes so that the plaintiff will be able to lift and handle the containers.

## MEDICAL EVIDENCE

The plaintiff was first seen by Dr. Lowell Stonecipher, an orthopaedic surgeon, on December 13, 1996. He diagnosed the plaintiff as being in the early stages of carpal tunnel syndrome, placed her on medication and prescribed splints for her to wear at night.

The plaintiff returned to see Dr. Stonecipher on January 6, 1997, and advised him that she was worse. Dr. Stonecipher ordered a nerve conduction test which was normal.

When Dr. Stonecipher saw the plaintiff on January 17, 1997, she was still having symptoms so he changed her medication and gave her a cortisone injection. The plaintiff returned three weeks later at which time he changed her medication again and ordered lab work.

Dr. Stonecipher last saw the plaintiff on May 7, 1997. He did not believe that the plaintiff had suffered any permanent anatomical impairment. He also testified that he did not take the plaintiff off work or place any job restrictions on her.

On July 14, 1997, the plaintiff saw Dr. Joseph Boals, an orthopaedic surgeon, for purposes of an evaluation. His examination revealed a positive Phalen's test bilaterally, generalized tenderness to touch over the wrist and very inadequate grip strength bilaterally. Dr. Boals diagnosed the plaintiff as suffering from overuse syndrome to both upper extremities and possible carpal tunnel syndrome bilaterally.

Dr. Boals testified that the plaintiff was a very difficult person to evaluate due to the plaintiff's symptomatology and marked loss of grip strength. He opined that the work that the plaintiff had performed for the nursing home for six months was the cause of her problems.

Dr. Boals testified that the plaintiff had suffered a 25% permanent anatomical impairment to each upper extremity. He equated 10% of the disability rating to a mild carpal tunnel syndrome with the remaining anatomical disability being given

for the loss of strength. He testified that his rating was a combination of loss of strength from overuse syndrome and the presence of carpal tunnel syndrome.

## I.

■ The defendant asserts that the plaintiff has not suffered a compensable injury as defined by the Workers' Compensation Act because she did not miss any time from work prior to her termination. The Workers' Compensation Act defines a compensable injury in pertinent part as " ... an injury by accident arising out of and in the course of employment which causes either disablement or death of the employee ..." T.C.A. § 50–6–102(a)(5). If all three elements are present, the injury is compensable. *Fink v. Caudle*, 856 S.W.2d 952, 958 (Tenn.1993).

In support of this argument, the defendant relies upon *Lawson v. Lear Seating Corp.* 944 S.W.2d 340 (Tenn.1997), and *Barker v. Home–Crest Corp.*, 805 S.W.2d 373 (Tenn.1991). The defendant argues that *Lawson* and *Barker* hold that a plaintiff is not entitled to disability benefits until the plaintiff suffers a compensable injury and misses work. The defendant's reliance on these cases, however, is misplaced. In *Lawson*, the Supreme Court reversed a trial court ruling that the plaintiff, who suffered from carpal tunnel syndrome, failed to commence her action within one year of the accident causing her injury. *Lawson*, 944 S.W.2d at 340. The Court noted that in the case of repetitive stress injuries identifying the "accident resulting in injury" is problematic because the symptoms appear and worsen over an extended period of time and may subside when the employee's job is altered. *Id.* at 341. After reviewing the approaches taken by other jurisdictions, the Court adopted "the last day worked" rule for determining when the statute of limitations period is triggered. *Id.* at 342.

"Each day Lawson worked contributed to her injury. Because there is no one particular incident or evidence identifiable as an "accident resulting in the injury" and because Lawson suffered new trauma to her hand each day she worked, we hold that the date of the accidental injury is the date that Lawson was no longer able to work because of her injury. The record establishes that June 17, 1993, was the first day that Lawson was unable to perform her job; therefore the statute of limitations commenced at that time."

*Id.* at 342–343.

*Barker* also involved a claim for carpal tunnel syndrome. The Supreme Court used the "last day worked" rule to determine that the insurer providing coverage on the date when the condition's severity prevented the employee from working would be responsible for compensation. 805 S.W.2d at 376.

The defendant misreads these cases to hold that a plaintiff is not entitled to disability benefits until the plaintiff suffers a compensable injury *and* misses work. Neither *Lawson* nor *Barker* addressed the issue of causation; neither case held that a worker has not been injured until the worker has missed work. *Lawson* was limited to identifying a date to trigger the running of the statute of limitations. *Barker* applied the "last day worked" rule to determine which insurer would pay benefits.

■ The "last date worked" rule was adopted in this state to prevent workers with gradual and repetitive injuries from losing the opportunity to bring claims due to the statute of limitations. Applying this narrow rule to questions of causation would create a precedent which would make any worker injured by repetitive stress ineligible for compensation unless that worker misses work. This application is inconsistent with the nature of the Tennessee Workers Compensation Act which is designed to protect workers from economic devastation following job-related injuries. *Betts v. Tom Wade Gin*, 810 S.W.2d 140, 142 (Tenn.1991).

"Tennessee's workers' compensation laws must be construed so as to ensure that injured employees are justly and appropriately reimbursed for debilitating injuries suffered in the course of service to the employer."

*Id.* at 142–43.

The medical evidence and the lay evidence in this case support a causal connection between the plaintiff's injury and her employment at the nursing home. We hold that her failure to miss work is not fatal to her claim.

## II.

The defendant asserts that the trial court erred in failing to give greater weight to the testimony of the treating physician than the evaluating physician.

The treating physician, Dr. Stonecipher, treated the plaintiff from December 13, 1996, until May 7, 1997. According to his records, he saw the plaintiff six times during this period. He believed that the plaintiff had an early carpal tunnel that would get worse over time. However, he did not take her off work nor did he restrict her in any way. He did not find that the plaintiff had suffered any permanent anatomical impairment.

Dr. Boals saw the plaintiff only once for purposes of an evaluation. He found the plaintiff to have a positive Phalen's test bilaterally, tenderness to touch over her wrists and very inadequate grip strength bilaterally. He diagnosed the plaintiff with severe overuse syndrome and possible carpal tunnel syndrome. He opined that the cause of the plaintiff's problem was the work she had performed for the nursing home. He testified that she suffered a 25% permanent anatomical impairment to both arms with 10% of the impairment relating to the carpal tunnel syndrome and the remainder attributed to her loss of strength.

Both Dr. Stonecipher and Dr. Boals testified by deposition. In making his ruling, the trial judge noted that he had the responsibility of reconciling the conflicting medical evidence.

When medical testimony differs, it is within the discretion of the trial judge to determine which expert testimony to accept. *Kellerman v. Food Lion, Inc.*, 929 S.W.2d 333, 335 (Tenn.1996); *Johnson v. Midwesco, Inc.*, 801 S.W.2d 804 (Tenn. 1990).

"[W]here the issues involve expert medical testimony and all the medical proof is contained in the record by deposition, as it is in this case, then this Court may draw its own conclusions about the weight and credibility of that testimony, since we are in the same position as the trial judge.... With these principles in mind, we review the record to determine whether the evidence preponderates against the findings of the trial court."

*Krick v. City of Lawrenceburg*, 945 S.W.2d 709, 712 (Tenn.1997); *see also Elmore v. Travelers Ins.*, 824 S.W.2d 541, 544 (Tenn. 1992) (when testimony is presented by deposition, this Court is in just as good a position as the trial court to judge the credibility of those witnesses.)

The trial court accredited the medical testimony of Dr. Boals. We find no compelling reason to disagree with the finding of the trial court.

## III.

The defendant asserts that the plaintiff has not suffered a vocational disability according to the Tennessee Workers' Compensation Act.

The plaintiff is a twenty-eight-year-old female who is a certified registered nurse. Prior to her injury, she worked as a nurse and in the home health field. She currently is employed as a medical case manager.

The plaintiff candidly testified about the effects this injury has had on her life. Since the injury, her strength has decreased by approximately 75%. She experiences daily pain in her hands. She cannot lift things as she could before the injury and has been required to modify her

behavior and lifestyle to complete the simplest of tasks. Driving a car causes her pain and she is no longer able to water ski or ride a jet ski. The plaintiff testified that she did not believe that she could work in any of her prior jobs due to the her lack of strength and her inability to lift repetitively.

██ The extent of an injured worker's disability is an issue of fact. *Jaske v. Murray Ohio Mfg. Co.*, 750 S.W.2d 150, 151 (Tenn.1988). The Supreme Court recently discussed what should be considered in determining vocational disability in *Walker v. Saturn Corp.*, 986 S.W.2d 204 (Tenn.1998). The Court stated that:

> "An anatomical impairment rating is not always indispensable to a trial court's finding of a permanent vocational impairment. In fact, anatomical impairment is distinct from the ultimate issue of vocational disability that the trial court must assess. An employee should not be denied compensation solely because she is unable to present a witness who will testify to the exact percentage of her medical impairment. (Citations omitted.)

\* \* \* \*

The Panel correctly held that a vocational impairment is measured not by whether the employee can return to her former job, but whether she has suffered a decrease in her ability to earn a living. *See Corcoran*, 746 S.W.2d at 458. This Court stated in *Corcoran* that a vocational disability results when "the employee's ability to earn wages in any form of employment that would have been available to him in an uninjured condition is diminished by an injury." *Id.* at 459.

In assessing the extent of an employee's vocational disability, the trial court may consider the employee's skills and training, education, age, local job opportunities, anatomical impairment rating, and her capacity to work at the kinds of employment available in her disabled condition. Further, the claimant's own assessment of her physical condition and resulting disabilities cannot be disregarded. The trial court is not bound to accept physicians' opinions regarding the extent of the plaintiff's disability, but should consider all the evidence, both expert and lay testimony, to decide the extent of an employee's disability." (Citations omitted.)

*Walker*, at 207–08.

We find that the trial court correctly determined that the plaintiff suffered a compensable injury to each arm and correctly applied the relevant factors in determining the amount of vocational disability suffered by the plaintiff. This issue is without merit.

### CONCLUSION

The defendant asserts that the trial court erred when it found that the plaintiff suffered a 35% permanent partial disability to each arm. We disagree. The judgment of the trial court is affirmed with the costs of this appeal being taxed to the defendant.

HOLDER, J., and LAFFERTY, S.J., concur.