IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
June 20, 2001 Session

## STATE OF TENNESSEE v. MATTHEW DeLOSS LARSEN and ANDREW LEE MATTHEWS

**Direct Appeal from the Criminal Court for Sumner County**
**No. 83-CTI-CR-696-1999     Jane Wheatcraft, Judge**

**No. M2000-01675-CCA-R3-CD - Filed October 12, 2001**

The defendants, Matthew DeLoss Larsen and Andrew Lee Matthews, were indicted for aggravated robbery and aggravated assault.  Pursuant to negotiated plea agreements, the defendants pled guilty to robbery, Tenn. Code Ann. § 39-13-401, and aggravated assault, Tenn. Code Ann. § 39-13-102, both Class C felonies. The defendants also agreed to serve consecutive sentences, with the manner of service and length of their sentences to be determined by the trial court.  Following a sentencing hearing, the trial court imposed five-year sentences for each felony conviction and denied any form of alternative sentencing, which resulted in effective sentences of ten years confinement for both defendants.  In this appeal, Larsen and Matthews separately challenge their sentences on similar grounds, essentially alleging that the trial court erred by (1) finding no mitigating factors were applicable in their respective cases, and (2) denying both defendants any form of alternative sentencing.  Our de novo review reveals that the trial court erred in its application of enhancement factors.  After a thorough review of applicable law and all relevant facts and circumstances in the record, we modify the trial court's sentencing determination concerning the length of the defendants' sentence for aggravated assault and affirm all other aspects of the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgment of the Criminal Court Affirmed, in Part, and Modified, in Part.**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which DAVID G. HAYES, J. and TERRY LAFFERTY, Sp.J., joined.

Randy P. Lucas, Gallatin, Tennessee, for the appellant, Matthew DeLoss Larsen; and Cheryl J. Skidmore, for the appellant, Andrew Lee Matthews.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; Lawrence Ray Whitley, District Attorney General; Sallie Wade Brown, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

# Factual Background

During the early morning hours of July 26, 1999, the Par Mart convenience store in Hendersonville was robbed of $177.69 by two armed men with red bandanas tied "Wild-West" style over each man's nose and mouth. The twenty-two-year-old clerk, Michael Cadorette, and his eighteen-year-old girlfriend, Crystal Parks, were the only two people in the store at the time. Cadorette called the police after the robbers left and placed Parks in the cooler for safekeeping in case they returned. When the police officers arrived, they took separate statements from Cadorette and Parks which detailed the following facts: two armed, black males robbed the store--one with a .22 caliber revolver and the other with a sawed-off shotgun; the man with the revolver made Parks sit on the ground facing a cabinet and ordered her not to look at him; the man with the shotgun directed Cadorette to give him the money from the cash register and said, "Hurry up, or I'll put a cap in your ass."

In the hours preceding the robbery, Officer Janel Rogan with the Hendersonville Police Department reported observing a Buick Riviera parked on the highway exit ramp across the street from the Par Mart store. A "tag check" on the vehicle revealed that it belonged to Andrew Lee Matthews. Since the vehicle had not been reported stolen, Rogan did nothing about it at that time. When Rogan returned to investigate the robbery, however, she noticed the Buick was gone, and a witness reported that it had been driven away at approximately the same time the police arrived to investigate the robbery. The officers began searching for the vehicle and registered owner, Andrew Lee Matthews. Arriving at Matthews' address, they discovered the vehicle and observed two men who matched the descriptions of the robbers. (The two men observed by the officers were the defendants, Matthews, and his roommate, Larsen.) The officers then approached the defendants to question them.

After Matthews was advised of his Miranda rights, he confessed to committing the robbery. Larsen initially denied any involvement with the crime; however, when he observed that Matthews was cooperating with the police, he also confessed and the two men were arrested. Matthews consented to a search of his vehicle and residence, whereupon the police officers discovered the following: a box of latex gloves and a red bandana, matching a glove and bandana they had found near the crime scene earlier; clothing similar to that reportedly worn by the defendants during the robbery; and $116 in cash ($55 on Matthews' person, and $61 in one-dollar-bills under the mattress). Matthews also provided the officers with the location of the "sawed-off" Ithaca pump 12-gauge shotgun used in the robbery and it was subsequently discovered, loaded, with one cartridge in the chamber and another in the magazine. A search of Larsen's person revealed $66 dollars in cash, which Larsen confessed was a part of the money from the robbery. Matthews and Larsen told the officers that they robbed the Par Mart because they needed money to pay rent. Matthews then proceeded to relate different stories about where and how he obtained the .22 caliber revolver used in the robbery. First, he told the police he purchased the weapon from an unknown person near his home. Next, he claimed to have borrowed the weapon and returned it after the robbery. Later, he told the police that he threw the revolver away. During the sentencing hearing, the trial judge urged Matthews to "come clean" with the accurate story. Matthews then testified that a passing stranger

loaned him the weapon after he overheard Matthews and Larsen planning the robbery while sitting in the street in front of his apartment. Matthews claimed that a few hours after the robbery, the unknown weapon donor showed up again to retrieve his gun and Matthews gave it back.

During the defendants' initial conversation with the police officers, both men denied drinking prior to the robbery, but admitted to buying a case of beer and cigarettes afterward. The defendants also shared responsibility for coming up with the idea and the planning of the robbery. The defendants told the police that they purchased the latex gloves at a Super Wal-Mart and the bandanas at a small Chinese store on their way to rob the Par Mart.

**Sentencing Hearing**

Matthews testified at the sentencing hearing that he was currently employed as a cashier at a Dollar General store and also enrolled as a student at Tennessee State University. He claimed that at the time of the robbery, however, he was unemployed for the first time in seven or eight years and was without money to pay his rent. Although his family had always been supportive and probably would have helped him, he said that pride prevented him from asking them for assistance. Matthews testified that he felt stressed because a number of his relatives were planning to come to Tennessee and live with him, but he was unable to be responsible for them financially. Matthews asserted that these circumstances caused him to start drinking, which then caused his mind to become unstable and eventually led to his commission of the instant crimes. He claimed that alcohol was to blame for all of his criminal actions.

Matthews also testified at length regarding the negative impact of his convictions on his life. He claimed repeatedly that he had not understood the "seriousness" of his crime. He was concerned that his criminal acts had affected his family, his friends, and his job in an unfavorable way and that his opportunities were subsequently limited in that he could no longer "do the things [he] used to do" or get the kinds of jobs he wanted. He was also disturbed because he had to change schools. Matthews claimed that since he had no experience with using a gun or committing robbery, he simply did not know what he was doing and armed robbery was "totally out of character" for him. Matthews admitted that when his family asked him what he would have done if the victims resisted, he told them he did not know for certain but that he would not have killed anyone. Matthews further testified that, because he had once been robbed himself, he had firsthand experience with the fear created by staring down the barrel of a gun. He apologized to the victims during his testimony, offering to assist them in any way he could.

Larsen testified at the sentencing hearing that he was seventeen years old at the time of the robbery. At the time of the hearing, he lived alone in a trailer and was employed at a "Legends" restaurant. Larsen had moved out of his mother's residence while he was in high school because he and his mother did not have a good relationship. Larsen claimed that his mother suffered from a chemical imbalance in her brain that caused her to get angry and throw things. His plan was to finish high school; his long-term goal was to become a basketball coach.

With regard to the robbery, Larsen testified that he had been drinking beforehand. However, he claimed that he was a casual drinker only and did not have a drug or alcohol problem. Larsen further stated that he had not given the consequences of the robbery much thought. He said that he knew the crimes he committed were very serious, but claimed that he was not "in the right state of mind" at the time. Among other things, he was dealing with some stressful problems and had no family in Tennessee to assist him. Larsen admitted that robbery was the first and only course of action that he and Matthews had considered as a solution to their money problems. Larsen further testified that the day before the robbery, he spent twenty dollars for a sawed-off shotgun because he lived in a "very rough neighborhood" and felt he needed protection; he claimed that he did not buy it in preparation for the robbery and that the stock was cut off before he purchased it.

During his testimony, Larsen extended his "sincerest regards" to the victims of his crime. He claimed that he also has been robbed at gunpoint three or four times and knew that "it is not a very pleasant feeling." Larsen denied telling the victim to "Hurry up, or I'll put a cap in your ass," but admitted that if the victim had pointed a gun at him during the robbery, he might have shot him.

Helen Larsen, the maternal grandmother of Larsen, testified that Larsen had been on his own since adolescence. Larsen's mother was declared manic depressive at the age of fourteen and refused to accept help from family for either herself or Larsen. Larsen's grandmother testified that she was willing to take full responsibility for Larsen. She requested permission from the trial court to take him to her farm in Illinois where he could live, work, and complete high school.

The defendants were each convicted of two Class C felonies. As Range I standard offenders, they may be sentenced to not less than three nor more than six years for each conviction. Tenn. Code Ann. § 40-35-112(a)(3) (1997). The defendants had previously agreed to consecutive sentencing; the purpose of the sentencing hearing was to determine the length and manner of service of their sentences. At the conclusion of the hearing, the trial court stated that the defendants' crimes were "terribly, terribly serious" and, after considering all of the evidence, including the presentence reports and the testimony presented, the trial court found both defendants equally responsible for the planning and execution of the crime.

The trial court also noted that both victims claimed to be too upset to face the defendants again and were, therefore, unavailable to testify at the sentencing hearing. Statements from the victims were included in the presentence report, however, and were reviewed by the trial court. Cadorette, the store clerk, attested to the following: after the robbery, he could no longer work for fear of being robbed a second time and quit his job. He avoided walking at night, being in the presence of African-Americans in general, and going into service stations whenever possible. Unable fo find new employment after the robbery, Cadorette subsequently ran out of money and was evicted from his apartment. Parks, the other victim, similarly complained that she lived in constant fear after the robbery because her job required her to work alone. She also stated that her life was no longer normal; after the robbery, she was afraid to walk down the street and to be around people, especially African-American men.

Concluding its sentencing determination, the trial court found three enhancement factors applicable to both defendants' sentences and no mitigating factors. Applying the factors in Tennessee Code Annotated subsections 40-35-113(3), (10), and (16), the trial court enhanced both defendants' sentences from the presumptive minimum in the range (three years) to five years for each felony. See id. § 40-35-210(c). Specifically, the trial court found the crimes involved more than one victim; the defendants showed no hesitation about committing the crimes where the risk to human life was high; and the potential for bodily injury was great. However, the record reveals that the trial court failed to affirmatively state what weight each factor received in its determination. Clearly disturbed by the negative impact the defendants' crime had on the victims, the trial court stated only that great emotional injury had occurred and that it was amazed no one was killed. The trial court then determined that Larsen and Matthews should serve their respective ten-year sentences in confinement, based on the fact that the crime was very serious and a need for deterrence existed. The trial court commented that Matthews seemed less concerned about the damage he caused innocent victims than the effect that the circumstances had on his own life, and further remarked that "somewhere down the line, perhaps these gentlemen can be rehabilitated, but [the court] was so appalled by the circumstances of the offense and the psychological damage to the victims, that [it] did not think a sentence of split confinement would serve the ends of justice . . . ."

**Analysis**

In this appeal, both defendants challenge the trial court's determination regarding the length of their sentences as well as the denial of any form of alternative sentencing. Specifically, Larsen contends that the trial court erred (1) by refusing to find that any mitigating factors applied to either sentence, (2) by applying the enhancement factors cited without including any mitigating factors, and (3) by refusing to consider alternative sentencing. We shall treat Larsen's first two issues as a single issue alleging non-application of appropriate mitigating factors. Matthews' contentions are almost identical to Larsen's. He argues that the trial court erred (1) by refusing to find that the proof supported application of any mitigating factors to either sentence and (2) in imposing a sentence of incarceration rather than any form of alternative sentencing.

When a defendant appeals the length, range, or manner of service of a sentence imposed by the trial court, this Court conducts a de novo review of the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). The presumption of correctness is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The burden of showing that the sentence is improper is upon the appealing party. Tenn. Code Ann. § 40-35-401(d), Sentencing Commission Comments. In conducting our review, we must consider all the evidence, the presentence report, the sentencing principles, the enhancing and mitigating factors, arguments of counsel, the defendants' statements, the nature and character of the offense, and the defendants' potential for rehabilitation. Tenn. Code Ann. §§ 40-35-103(5), -210(b) (1997 & Supp. 2000); Ashby, 823 S.W.2d at 169. When, as here, we find that the trial court improperly applied enhancement factors and failed to clearly articulate how the mitigating and enhancement factors were evaluated and balanced in determining the sentence, our review is de

novo, with no presumption of correctness given to the trial court's sentencing determinations.  See State v. Jones, 883 S.W.2d 597, 599-600 (Tenn. 1994).

### A.  Length of Sentences

Defendant Larsen contends that the following statutory mitigating factors are applicable in his case: (6) "[t]he defendant, because of youth or old age, lacked substantial judgment in committing the offense";  (7) "[t]he defendant was motivated by a desire to provide necessities for the defendant's family or the defendant's self"; (11) "[t]he defendant . . . committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated his criminal conduct"; and (13) "[a]ny other factor consistent with the purposes of this chapter," i.e., the defendant Larsen freely admitted his guilt and also expressed remorse for committing the crime.  Tenn. Code Ann. § 40-35-113(6), (7), (11), and (13) (1997).  We disagree.

In favor of mitigation due to youth, Larsen submits that because he was seventeen years old at the time of the crime, he never knew his father, his mother lacked the proper parental skills due to mental illness, and he was forced to drop out of high school to support himself, he therefore lacked substantial judgment to the extent that the trial court's failure to apply  mitigation factor (6) is error.  Although this Court is sympathetic to young adults that must face difficulties while growing up, Larsen's circumstances do not demonstrate an inability to appreciate the nature of his criminal conduct due to age.  See State v. Adams, 864 S.W.2d 31, 33 (Tenn. 1993) (courts should consider the concept of youth in context, i.e., the defendant's age, education, maturity, experience, mental capacity or development, and any other pertinent circumstance tending to demonstrate the defendant's ability or inability to appreciate the nature of his conduct).  Larsen testified that he knew his crimes were "very serious."  In fact, he claimed that he had been robbed three or four times himself and found the experience "unpleasant."  Accordingly, factor (6) does not apply to his circumstances.

Mitigating factor (7), which requires proof that a defendant was motivated to commit his crimes by a desire to provide necessities for himself, is likewise not established by the proof.  In fact, the record reveals that Larsen probably thought little of "necessities" at the time of his crime, as displayed by the exercise of extremely poor judgment in managing what money he did have.  Notwithstanding the fact he and Matthews had insufficient funds to pay rent, Larsen confessed that he spent twenty dollars for a shotgun the day before the robbery.  He further testified that the purchase was to provide for his general protection and not in preparation for committing the crime.  Moreover, both defendants admitted that after the robbery, they used a portion of their ill-gotten gains to purchase cigarettes and beer.  These purchases clearly fail to indicate that the desire for "necessities" was sufficient to apply factor (7).

Larsen's next contention, that he "committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated his criminal conduct," is likewise without merit.  Larsen submits that factor (11) applies, but only because his mother prevented his grandmother from assisting him with support and/or a place to live when he was

younger. Without more, we fail to see a logical nexus between the grandmother's frustrated attempts to help Larsen years ago and the unusual circumstances required to apply factor (11). This factor does not apply.

Larsen also argues that the trial court erred when it refused to mitigate his sentence based on both his free admission of guilt and his remorse for committing the crime. The record shows that Larsen confessed guilt for the crimes after the defendants were discovered and Matthews had consented to a search of the getaway car and apartment. Clearly, there was a good chance that Larsen's complicity would be revealed when the police questioned Matthews further. Because the discovery of his involvement appeared inevitable, his "free admission of guilt" is entitled to little favorable consideration. Neither is Larsen's profession of "remorse" a mitigating factor here. Rather, we concur with the trial court's opinion that the defendants' crimes were the "acts of people who have no conscience and who don't care about how other people react."

Defendant Matthews also contends that his sentence is excessive and asserts that the following mitigating factors are applicable: (6) "[t]he defendant, because of youth or old age, lacked substantial judgment in committing the offense"; (7) "[t]he defendant was motivated by a desire to provide necessities for the defendant's family or the defendant's self"; (9) "[t]he defendant assisted the authorities in . . . detecting or apprehending other persons who had committed the offenses"; (10) "[t]he defendant assisted the authorities in locating or recovering any property or person involved in the crime; and (13) "[a]ny other factor consistent with the purposes of this chapter," i.e., Matthews expressed "substantial" remorse for committing the crime. Id. § 40-35-113(6), (7), (9), (10), and (13). Again, we disagree.

With regard to mitigating factor (6), Matthews failed to demonstrate that he lacked substantial judgment or that he was unable to appreciate the nature of his criminal conduct due to youth. Matthews was twenty-two at the time he committed the offense and, barring unusual circumstances which would prove impaired judgment, not sufficiently youthful to apply this factor. Factors (7) and (13), which may allow mitigation for crimes motivated by a desire to provide necessities and a showing of remorse, respectively, are also inapplicable to Matthews' circumstances for reasons substantively analogous to those discussed above in Larsen's case. Basically, the fact that the defendants purchased beer and cigarettes with the stolen money renders their claim of motivation by a desire for necessities implausible. It is likewise nonsensical to condone armed robbery as a solution to possible late rent payments. Concerning remorse, we agree with the trial court that Matthews' expressions of penitence appear to be grounded more in sympathy for himself that for that of his victims.

The two remaining mitigating factors in Matthews's argument would require us to find that he assisted the authorities in detecting or apprehending Larsen and/or that he assisted the police in locating or recovering any property or persons involved in the crime. See id. § 40-35-113(9), (10). The record contains no proof that Matthews aided the police officers in recovering the money outside of giving his consent to search. Matthews argues that his "assistance" in apprehending Larsen was proven by the fact that Larsen was unwilling to cooperate with the police until Matthews cooperated.

-7-

However, nothing in the record indicates that Larsen's decision to confess had anything to do with prompting on the part of Matthews.

Having determined that mitigating factors do not apply in the case of either defendant, we review the trial court's application of enhancement factors. To briefly recount, both defendants were convicted of one count each of robbery of Michael Cadorette and of aggravated assault of Crystal Parks. Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear. Tenn. Code Ann. § 39-13-401 (1997). As charged here, aggravated assault is committed by a person who intentionally or knowingly causes another to reasonably fear imminent bodily injury and uses or displays a deadly weapon. See Tenn. Code Ann. §§ 39-13-101, -102 (1997). The record reveals that the trial court enhanced each of the sentences of both defendants from three to five years for each felony by applying the following factors: (3) "[t]he offense involved more than one (1) victim"; (10) "[t]he defendant had no hesitation about committing a crime when the risk to human life was high"; and (16) "[t]he crime was committed under circumstances under which the potential for bodily injury to a victim was great." Tenn. Code Ann. § 40-35-114(3), (10), and (16) (1997). After a review of the record and applicable law, we find enhancement factor (10) applies to the defendants' sentences for aggravated assault and robbery, factor (16) is applicable to the sentences for robbery only, and enhancement factor (3) can be used to enhance the sentences for neither offense.

Enhancement factor (3) does not apply because neither offense committed by the defendants involved more than one victim. This Court has determined that the use of the word "victim," as contemplated by Tennessee Code Annotated section 40-35-114(3), is limited in scope to a person or entity that is injured, killed, had property stolen, or had property destroyed by the perpetrator of the crime. State v. Raines, 882 S.W.2d 376, 384 (Tenn. Crim. App. 1994). Here, the defendants were convicted for the crime of robbery against Michael Cadorette and for the aggravated assault of Crystal Parks. Because no property was destroyed or taken from Parks during the robbery, and she was not injured or killed as a result, she was not a "victim" of the robbery. Moreover, the factor applicable where the offense involves more than one victim may not be applied to enhance a sentence where the defendant is separately convicted of offenses against each victim. State v. Williamson, 919 S.W.2d 69, 82 (Tenn. Crim. App. 1995); State v. Makoka, 885 S.W.2d 366, 373 (Tenn. Crim. App. 1994); State v. Lambert, 741 S.W.2d 127, 134 (Tenn. Crim. App. 1987); State v. Curtis Lee Majors, No. 01C01-9602-CR-00076, 1997 WL 424436 at *9, Davidson County (Tenn. Crim. App., Nashville, July 30, 1997) perm. to app. denied (Tenn. 1998) (enhancement factor (3) did not apply where defendant committed an armed robbery of a restaurant with three employees and was subsequently convicted of one count of aggravated robbery and two counts of aggravated assault because he was convicted for separate offenses for each victim). Therefore, because Parks was not a victim of the robbery offense, and both defendants were separately convicted of an offense against Cadorette, this factor does not apply.

When determining whether enhancement factor (10) applies, the initial inquiry is whether proof of this enhancement factor would also prove an essential element of the offense. See State v. Jones, 883 S.W.2d 597, 603 (Tenn. 1994). Put another way, where a high risk to human life is

established with proof separate from that necessary to establish an element of the offense, enhancement factor (10) may be applied if supported by the facts. State v. Bingham, 910 S.W.2d 448, 452 (Tenn. Crim. App. 1995) overruled on other grounds, State v. Hooper, 29 S.W.2d 1 (Tenn. 2000). Enhancement factor (10) is appropriate in cases where the defendant demonstrates a culpability distinct from and appreciably greater than that incident to the offense for which he was convicted. Jones, 883 S.W.2d at 603. In the case sub judice, proof that a high risk to the lives of Cadorette and Parks existed during the defendants' commission of the robbery was established by the fact that they each used deadly weapons (firearms) to commit the crime. Such evidence demonstrated a culpability distinct from and appreciably greater than that necessary to commit the offense of robbery and was not required to prove the elements of this crime. In contrast, the defendants' use of deadly weapons did establish an essential element of the offense of aggravated assault. See State v. Hill, 885 S.W.2d 357, 363-64 (Tenn. Crim. App. 1994) (as a general rule, enhancement factors (10) and (16) are inherent in the crime of aggravated assault accomplished through the use of a deadly weapon). However, even when the facts proving factor (10) likewise establishes an element of the offense, it may still be applied where the defendant creates a high risk to the life of a person other than the victim. State v. Bingham, 910 S.W.2d 448, 452 (Tenn. Crim. App. 1995). Since Cadorette was a victim of the robbery only, and not the aggravated assault offense, the risk to his life which resulted from the aggravated assault against Parks permits the application of enhancement factor (10) to the defendants' sentences for aggravated assault, in addition to the sentences for robbery. See State v. Lavender, 967 S.W.2d 803, 808 (Tenn. 1998) (facts supported application of factors (10) and (16) to defendant's sentence for robbery where victims were informed one of them would be killed if they did not cooperate and each feared for the safety of the other).

Lastly, regarding enhancement factor (16), we similarly observe that the proof required to show the crime was committed under circumstances where potential for bodily injury was great was established by the defendants' use of deadly weapons and, further, that this proof was necessary to prove an essential element of the offense of aggravated assault, but not to prove an element of the robbery offense. Therefore, factor (16) may be applied to the defendants' sentences for robbery if supported by the facts. Specifically, the record shows that the defendants entered the Par Mart store brandishing a sawed-off shotgun and a revolver, and Larsen informed the victim, Cadorette, that if he did not hurry up he may receive "a cap in [his] ass." The presence of the firearms, combined with the verbal threat to Cadorette and the fact that Larsen admitted he might have shot Cadorette if he had presented a weapon, clearly indicates a potential for great bodily injury to the victim existed during the defendants' commission of the robbery. Thus, since both defendants used firearms, factor (16) may be used to enhance the defendants' sentences for robbery, but not aggravated assault.

To facilitate meaningful appellate review, "the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence." State v. Jones, 883 S.W.2d 597, 599-600 (Tenn. 1994). The weight afforded an enhancement or mitigating factor is left to the discretion of the trial court if the trial court complies with the purposes and

principles of the Tennessee Criminal Sentencing Reform Act of 1989 and the record supports its findings. State v. Hayes, 899 S.W.2d 175, 185 (Tenn. Crim. App. 1995).

As previously observed, the trial court inappropriately applied enhancement factors and failed to articulate how the mitigating and enhancement factors were balanced in determining the sentence, stating only that great emotional injury had occurred and that it was "just amazing no one was killed." To recount, our de novo review reveals that enhancement factor (10) applies to the defendants' sentences for both convictions; factor (16) applies to the defendants' sentences for robbery only, and not aggravated assault; and enhancement factor (3) does not apply to either defendant's convictions. No mitigating factors apply. Thus, for purposes of determining sentence length, two enhancement factors apply to the defendants' sentences for robbery, one enhancement factor applies to their conviction for aggravated assault, and no mitigating factors of significant weight were applicable to either conviction in either defendant's case.

Accordingly, we affirm the trial court's sentencing determination concerning the robbery conviction for both defendants. The record reveals that enhancement factors (10) and (16) are deserving of great weight, which is more than sufficient, standing alone, to support the five-year sentence for robbery imposed by the trial court. As to the defendants' sentences for aggravated assault, our statute provides that where there are enhancement factors but no mitigating factors, the court may set the sentence above the minimum in the range, three years in this case, but still within that range (three to six years). See Tenn. Code Ann. § 40-35-210(d) (1997). Therefore, because we find that one enhancement factor but no mitigating factors apply, we order that both defendants' sentences for aggravated assault be reduced from five years to four years and that the judgment be amended to reflect this modification.

**B. Denial of Alternative Sentencing**

Both defendants also challenge the trial court's denial of any form of alternative sentencing. Larsen contends that the trial court erred (1) by failing to address the statutory presumption favoring alternative sentencing, Tennessee Code Annotated section 40-35-102(6), and (2) by basing its denial of alternative sentencing on inadequate findings. Matthews' contention that incarceration is improper relies on similar premises: (1) the favorable statutory presumption to which he was entitled was unsuccessfully rebutted by evidence to the contrary, and (2) the principles outlined in Tennessee Code Annotated section 40-35-103 support alternative sentencing in his case. For reasons which follow, we affirm the trial court's denial of alternative sentencing..

As Range I, standard offenders convicted of Class C felonies, both defendants may be presumed to be favorable candidates for alternative sentencing options in the absence of evidence to the contrary. Tenn. Code Ann. § 40-35-102(6) (1997). The presumption in favor of alternative sentencing may be rebutted by evidence that (1) "confinement is necessary to protect society by restraining the defendant who has a long history of criminal conduct," (2) "confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses," or (3) "measures less restrictive

than confinement have frequently or recently been applied unsuccessfully to the defendant." Id. § 40-35-103(1)(A)-(C); see Ashby, 823 S.W.2d at 169. In addition, a defendant's potential for rehabilitation or lack thereof should be examined when determining whether an alternative sentence is appropriate. Tenn. Code Ann. § 40-35-103(5).

The record reveals that the trial court considered the presentence report and heard testimony from the defendants as well as their families and friends at the sentencing hearing. In accordance with Tennessee Code Annotated section 40-35-103, the court then considered, inter alia, whether confinement was necessary to avoid depreciating the seriousness of the offense and to provide an effective deterrence to others likely to commit similar offenses. It decided affirmatively. The court acknowledged that neither defendant had an extensive criminal history and expressed some distress at "putting young people in the penitentiary." However, when it considered the impact on the victims, the seriousness of the crime, and the resulting need to deter others from committing similar crimes, the trial court concluded that neither defendant was a favorable candidate for alternative sentencing. The trial court then sentenced both defendants accordingly, commenting that split confinement would not "serve the ends of justice."

Larsen argues that the trial court erred by refusing to consider alternatives to incarceration and by ignoring the statutory presumption which favors alternative sentencing. Our review of the record indicates otherwise. The trial court did not "refuse to consider" whether alternative sentencing would be proper in lieu of incarceration. Rather, it candidly stated that it found it "difficult" to order incarceration for young people and, further, that it did so "with a heavy heart." Regarding the trial court's failure to address the statutory presumption, our statute does not direct the trial court to affirmatively or unequivocally verbalize at what point it considers the statutory presumption set forth in Tennessee Code Annotated section 40-35-102(6). Here, the record contains numerous references which indicate the trial court considered sentencing alternatives, to wit: the trial court's statement that it was unable to conscientiously order split confinement, and its deliberation over the evidence which contradicted the statutory presumption; evidence which was ultimately successful in rebutting the presumption favoring alternative sentencing. See also State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

Larsen also argues that the trial court's denial of alternative sentencing was not based on adequate findings of fact. The record reveals that the court considered confinement necessary because the crime was "very, very serious." We believe that this statement indicated the trial court's intention to "avoid depreciating the seriousness of the offense." Larsen contends that the law does not allow the trial court to deny alternatives to incarceration based solely on the seriousness of the offense, citing State v. Hartley, 818 S.W.2d 370, 374-75 (Tenn. Crim. App. 1991). The defendant's assertion is correct; however, the trial court did not base it denial solely on the seriousness of the offense, but further found "such a need to deter people from committing this crime that this is going to be a sentence of incarceration." Although the record could be significantly clearer with regard to what facts underlied the trial court's finding of a need for deterrence, for the reasons following, we affirm its denial of alternative sentencing in this particular matter.

As previously stated, a trial court may properly deny alternative sentencing and order confinement when it finds incarceration is necessary to "avoid depreciating the seriousness of the offense or . . . provide an effective deterrence to others likely to commit similar offenses" pursuant to Tennessee Code Annotated section 40-35-103(1)(B). These two conditions constitute "evidence to the contrary," proof of which may be used to overcome the statutory presumption in favor of alternative sentencing under Tennessee Code Annotated section 40-35-102(6). State v. Lane, 3 S.W.3d 456, 462 (Tenn. 1999) (citing State v. Davis, 940 S.W.2d 558, 560 (Tenn. 1997)). When a trial court decides to deny probation based *solely* upon the nature of the offense, "the criminal act, as committed, must be 'especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree,' and the nature of the offense must outweigh all factors favoring probation." State v. Lane, 3 S.W.3d 453, 462 n.15 (Tenn. 1999) (citations omitted). By contrast, sufficient proof that confinement is necessary to provide deterrence requires only that confinement be "particularly suited" to provide a deterrent effect; "it does not require proof that incarceration 'will' or 'should' deter others from committing similar crimes." State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000). Deterrence is discussed further below.

First, we find the trial court's intention to avoid depreciating the seriousness of the offense is a valid objective under the circumstances of this case. Both defendants were armed, and both admitted that they could not predict how they would have responded if the victims had resisted. Although the instant convictions were for robbery, in lieu of aggravated robbery (the indicted offense), a sentencing court is not prohibited from considering criminal behavior for which there has been no conviction. State v. Winfield, 23 S.W.3d 279, 283 (Tenn. 2000) (citing State v. Carico, 968 S.W.2d 280, 287 (Tenn. 1998)). Facts relevant to sentencing must be proven only by a preponderance of the evidence. Id. Further, because the record reflects that the trial court did not deny alternative sentencing based *solely* on the nature of the offense, we may infer that the court assumed it was unnecessary to find that the criminal act, as committed, was "especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree" as required by law when the serious nature of the offense is the sole ground. Lane, 3 S.W.3d at 462 n.15.

Deterrence is an additional pragmatic objective, and alternative sentencing may be properly denied on the basis of deterrent issues alone. See Hooper, 29 S.W.3d at 6. In Hooper, our supreme court relaxed the standards set forth by previous case law which demanded that certain types of proof be presented to show that incarceration would or should result in deterrence. See id. at 10. In doing so, it emphasized that "the record must contain some proof of the need for deterrence before a defendant, who is otherwise eligible for probation or other alternative sentence, may be incarcerated." Id. at 9. Because the "science" of deterrence is imprecise at best, the supreme court also stated that the trial courts should be given "considerable latitude in determining whether a need for deterrence exists and whether incarceration appropriately addresses that need." Id. at 10. Accordingly, a trial court's decision to incarcerate a defendant based on a need for deterrence may be presumed to be correct "so long as any reasonable person looking at the entire record could conclude that (1) a need to deter similar crimes is present in the particular community, jurisdiction,

or in the state as a whole, and (2) incarceration of the defendant may rationally serve as a deterrent to others similarly situated and likely to commit similar crimes." Id.

Although denial of alternative sentencing may be justified in the instant case on this basis, the law plainly requires that the record contain *some* evidence to support the finding. The record in the case sub judice is somewhat lacking regarding the need to deter other persons from committing similar crimes, however, even under the relaxed standard set forth in Hooper. If the trial court's conclusion concerning deterrence was based on some type of proof, it failed to affirmatively articulate what that proof was. According to the record, the trial court stated only that "there is such a need to deter people from this crime that this is going to be a sentence of incarceration." We further note that the State had ample opportunity to present evidence for the need for deterrence, but for whatever reason, declined to do so. The prosecution could have easily questioned Detective Barry Russell, who testified at the sentencing hearing. As an officer with the Hendersonville Police Department, Russell should be familiar with the incidence of the various crimes in the vicinity and able to testify as to the number of robberies that occurred in the City of Hendersonville or Sumner County, thus satisfying the requirement for proof of a need for deterrence of persons other than the defendants. As it stands, this record contains no proof that any other robberies have been committed in these particular areas.

Notwithstanding the lack of affirmative findings regarding this matter, we find the record contains sufficient proof to establish deterrence in light of the supreme court's decision in Hooper. In Hooper, the supreme court provided five factors for the trial court to consider when deciding "whether a need for deterrence is present and whether incarceration is particularly suited to achieve that goal." Hooper, 29 S.W.3d at 10. As relevant here, factor two requires the court to consider "whether the defendant's crime was the result of intentional, knowing, or reckless conduct or was otherwise motivated by a desire to profit or gain from the criminal behavior." Id. at 11. From the evidence elicited at the sentencing hearing, it is clear that the robbery was the result of well-planned, intentional conduct. This was basically proved by the defendants' admission that they planned the robbery a significant amount of time beforehand: Matthews testified that he and Larsen discussed the robbery in the street in front of his house (so loudly, in fact, that a passerby loaned him a gun to accomplish the crime); Larsen purchased a shotgun the day prior to the robbery; and the defendants admitted to stopping at two different stores on their way to rob the Par Mart in order to purchase gloves and bandanas for their "bandido" disguise. The defendants even confessed to selecting the target for their crime in advance: Larsen testified that he picked it out because Matthews was unfamiliar with the area. The record also contains proof that the robbery was motivated by a desire to profit or gain from the criminal behavior: the defendants admitted that they robbed the store to provide themselves with rent money and that they purchased beer and cigarettes afterward. As a final matter regarding the deterrence issue, we note that because the sentencing hearing took place on June 2, 2000, and the decision in Hooper was filed on September 21, 2000, the case was unavailable to the trial court when it sentenced the defendants. However, the rule which requires the trial court to state what evidence it relied upon to support its finding of a need for deterrence is long-standing, and *some* evidence has always been required. Notwithstanding the state of the record, a finding of deterrence is supported in this case for the reasons stated above.

Although not specifically mentioned by the trial court, the defendants or the State, we believe the potential for rehabilitation and its lack thereof is a further proper consideration in determining whether sentence alternatives are appropriate in the case <u>sub judice</u>. Tenn. Code Ann. § 40-35-103(5) (1997). This Court has previously held that a defendant's lack of candor, credibility, and willingness to accept responsibility for his crime are further relevant considerations in determining a defendant's potential for rehabilitation. <u>State v. Zeolia</u>, 928 S.W.2d 457, 463 (Tenn. Crim. App. 1996); <u>State v. Dowdy</u>, 894 S.W.2d 301, 306 (Tenn. Crim. App. 1994); <u>State v. Anderson</u>, 857 S.W.2d 571, 574 (Tenn. Crim. App. 1992). Larsen claimed to be sorry for his crime, but then proceeded to lay blame for his criminal conduct on the fact that his childhood was plagued with problems and he had been drinking beforehand. This apparent unwillingness to accept responsibility decreases his potential for rehabilitation and is yet another factor indicating that incarceration is appropriate.

Matthews also contends that his incarceration is improper. Specifically, he argues that (1) the favorable statutory presumption to which he was entitled by law was unsuccessfully rebutted by evidence to the contrary, and (2) the principles outlined in Tenn. Code Ann. § 40-35-103 support alternative sentencing in his case. We disagree.

Concerning the statutory presumption, Matthews submits that the State did not present sufficient proof of "evidence to the contrary" because the trial court is precluded from denying alternative sentencing based solely on the seriousness of the offense and that, under <u>State v. Bingham</u>, 910 S.W.2d 448 (Tenn. Crim. App. 1995), it is also prohibited from ordering incarceration based on a need for deterrence without proof that his confinement will have a deterrent effect. He asserts that a need for deterrence in Sumner County or any other county in Tennessee was not proven. Defendant is correct in all of his assertions. However, as we concluded above, the record shows that the trial court did not deny alternative sentencing based solely on the serious nature of the crime, but also relied upon the need to provide an effective deterrence and that this finding is supported by the facts and circumstances contained in the record.

Matthews also argues that the remorse and willingness to accept responsibility displayed by him at the sentencing hearing was given no weight by the trial court. The trial court astutely observed that the majority of Matthews' concern and sorrow was directed at his own plight, not that of the victims. Moreover, according to Matthews testimony, he blamed not part, but *all* of his criminal conduct on the fact that he had been drinking prior to the crime. As previously mentioned, a defendant's willingness to accept responsibility for his crime is a relevant consideration in determining rehabilitation potential. <u>Zeolia</u>, 928 S.W.2d at 463. Here, there is no such evidence.

Accordingly, after a thorough review of the record and applicable law, we concur with the trial court's result in denying the defendants any form of alternative sentencing. Specifically, we find that a sentence of incarceration is appropriate under the circumstances presented because the record shows that (1) confinement is necessary to avoid depreciating the seriousness of the offense, (2) confinement is particularly suited to provide an effective deterrence, and (3) the defendants

demonstrate a lack of potential for rehabilitation.  Thus, the defendants are not entitled to relief on this issue.

## Conclusion

For the forgoing reasons, the trial court's sentencing determination is affirmed, in part, and modified, in part.  We affirm the trial court's determination with regard to the defendants' sentences for the offense of robbery.  Concerning the defendants' sentences for aggravated assault, we reduce the length from five years to four years in accordance with our conclusions concerning mitigating and enhancement factors and remand this matter to the trial court to enter an amended judgment which reflects this modification and results in an effective sentence of nine years for each defendant. All other aspects of the trial court's judgment are affirmed.

_____
THOMAS T. WOODALL, JUDGE