IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 13, 2002

## STATE OF TENNESSEE v. ANDRE MAYS and CORTEZ BENNETT

**Appeal from the Criminal Court for Davidson County**
**No. 99-D-2341      Steve Dozier, Judge**

---

**No. M2001-02151-CCA-R3-CD - Filed October 22, 2002**

---

The Appellants, Andre Mays and Cortez Bennett, were convicted by a Davidson County Jury of first degree murder, attempted first degree murder, and two counts of especially aggravated robbery. Mays and Bennett were sentenced to life imprisonment plus fifty years. On appeal, Mays argues that the trial court erred in allowing a juror to remain on the panel after reading a prejudicial newspaper article during the trial. Bennett raises the following issues for review: (1) whether the trial court erred in not suppressing the photographic line-up; (2) whether the evidence was sufficient to support the verdicts; and (3) whether his sentence was proper. After a review of the record, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed.**

DAVID G. HAYES, J., delivered the opinion of the court, in which JOE G. RILEY and NORMA MCGEE OGLE, JJ., joined.

Monte D. Watkins, Nashville, Tennessee, for the Appellant, Andre Mays; Cynthia F. Burnes, Nashville, Tennessee, for the Appellant, Cortez Bennett.

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; Peter M. Coughlan, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and Jon Seaborg, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

### Factual Background

On June 29, 1999, the Appellants, Andre Mays and Cortez Bennett, were together with Eric Booth and Tywaun Morrow drinking. Earlier that day, they had "snorted cocaine and smoked marijuana laced with cocaine." During the evening, Mays discussed with the others the robbery of Tonya and Wesley Tyler Sr. at their residence in Nashville. Booth drove to the area and parked

several houses away from the Tylers' residence. Morrow and the Appellants exited the vehicle and went towards the house. Bennett was carrying a "tech nine," a large handgun, and Mays had a small caliber revolver. Morrow returned to the car shortly thereafter.

Around 11:00 p.m., Wesley Tyler Sr. heard his dog barking. He went downstairs to quiet the dog; while downstairs, Mr. Tyler heard his wife call his name. Mr. Tyler then proceeded upstairs and, as he came up the steps, he "saw Bennett there with gun on [his two] children there on the floor." Another child was asleep in a bedroom. Hearing Mr. Tyler come up the stairs, Bennett, who was wearing a ski-mask, pointed the gun at him. Mr. Tyler turned and ran back downstairs but stopped when he heard Mays call his name. Mr. Tyler recognized Mays voice, having previously met him several times. Mays pointed a gun at Mr. Tyler, told him to "shut up," and forced him upstairs.

Mays took money from the Tylers' dresser and then asked, "[W]here's the safe?" Mrs. Tyler responded that the safe was downstairs. Mr. Tyler offered to go get it, but Mays grabbed Mrs. Tyler and forced her downstairs. He stated to Mr. Tyler that he "was going to take care of [him] later." Bennett stayed in the living room with the children and Mr. Tyler. After several minutes had passed, Mays and Mrs. Tyler returned upstairs with the safe. Then, Mays and Mrs. Tyler went to her bedroom to retrieve the key. Upon their return to the living room, Mr. Tyler said, "you've got everything, you know, that we can give you. I mean, man, just take it and go. Mays then told Bennett to "hold on [before leaving the residence], . . . I'm going to take care of a little business first." Mays asked for Bennett's gun, and Bennett refused. Mays ordered Mr. and Mrs. Tyler to stand up and go into the bathroom. Mr. Tyler sat in the tub, and Mrs. Tyler sat on the toilet. Mays followed the couple into the bathroom, and Bennett stood outside the bathroom doorway. Mr. and Mrs. Tyler began to pray. Mays proceeded to shoot Mr. Tyler three times in the head. Mr. Tyler "laid over as if [he] was dead, but [he] wasn't dead." Mays then turned the gun on Mrs. Tyler and shot her twice in the head. The Appellants ran from the residence, carrying a small grey safe and guns.

Mr. Tyler, hearing his children "running around," got out of the tub and checked on his wife, who was not moving. He then crawled into the kitchen and phoned 911, but he was unable to speak because his vocal cords and jawbone were damaged. Wesley Tyler Jr., then five years old, spoke with the 911 officer and gave her the pertinent information. Both Mr. and Mrs. Tyler were transported to the hospital for treatment. Mrs. Tyler died as a result of her injuries; however, Mr. Tyler survived. During the ambulance ride to the hospital, Mr. Tyler wrote on a bag, "Dre from north Sixth shot me."[1]

After leaving the residence, the Appellants and Booth and Morrow drove to a nearby Nashville residence and divided the money. The Appellants and Booth returned to the car and, in a nearby alley, threw out the revolver, the safe, some gloves, and a dark shirt. Subsequently, Wesley

---

[1]At trial, testimony established that Mays, whose first name is Andre, is commonly referred to as Dre.

Tyler Sr. and Jr. identified Mays from a photo array, but only Wesley Tyler Sr. was able to identify Bennett from a photo array. Rings, belonging to Tonya Tyler, were discovered in Mays' pocket.

All four men were arrested and, on October 19, 1999, were indicted for Count I, first degree murder of Tonya Tyler; Count II, felony murder of Tonya Tyler; Count III, especially aggravated robbery of Tonya Tyler; Count IV, attempted first degree murder of Wesley Tyler Sr.; and Count V, especially aggravated robbery of Wesley Tyler Sr. After a trial by jury, Bennett and Mays were found guilty of all charges. Count II was merged with Count I, and the Appellants received a total sentence of life imprisonment plus fifty years. This appeal followed.

## ANALYSIS

### I. Removal of Juror

The Appellant Mays argues that "the Trial Court made a serious error in allowing a juror to remain on the jury after she violated his instruction not to read any newspaper articles about the trial."
When there is extraneous prejudicial information or any outside influence is brought to bear on a juror, the validity of the verdict is questionable. *State v. Parchman*, 973 S.W.2d 607, 612 (Tenn. Crim. App. 1997). Rule 606(b) of the Tennessee Rules of Evidence prohibits a juror from giving testimony on "any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotion as influencing" his or her vote. Tenn. R. Evid. 606(b); *see also State v. Blackwell*, 664 S.W.2d 686, 689 (Tenn. 1984). However, the rule allows a juror to "testify on the question of whether any extraneous prejudicial information was improperly brought to the jury's attention [or] whether any outside influence was improperly brought to bear upon any juror. . . ." Tenn. R. Evid. 606(b).

If it is shown that one or more jurors has been exposed to extraneous prejudicial information or improper influence, there arises a rebuttable presumption of prejudice, and the burden then shifts to the prosecution to explain the conduct or to demonstrate the harmlessness of it. *Parchman*, 973 S.W.2d at 612; *State v. Young*, 866 S.W.2d 194, 196 (Tenn. Crim. App. 1992). In order to shift the burden to the prosecution to demonstrate the harmlessness of the communication with the jury, the threshold question is whether the statement communicated to the jury was prejudicial to the Appellant. *Parchman,* 973 S.W.2d at 612.

At the motion for new trial hearing, the trial court found that:

> I mean, there was a juror, that the Court became aware of, had read an article in the – dealing with the trial on the last day of trial.
>
> The Court brought that juror down, and the juror was emphatic that there was no information that she would consider from that article, if there was any information

or – there was, obviously, information in the article about the trial – but that she could set that aside and not consider it.

The Court looked at the article and determined there was absolutely nothing in there that was – would be prejudicial in any way to Mr. Mays, in terms of for instance, prior convictions or pending cases or anything extraneous, that was not testified to at the trial.

I mean, did the juror violate the Court's order? Sure. But, after interviewing the juror, with Counsel here, I don't think it was error to allow her to continue with the trial.

After review of the newspaper article, we agree with the trial court that the article was not prejudicial to the Appellant because it did not contain any information that was not testified to at trial. The juror testified that the newspaper article would not effect her impartiality when deciding the Appellant's guilt. The Appellant has failed to show prejudice resulting from the juror reading the newspaper article. Accordingly, we find no error or abuse of discretion by the trial court.

## II. Suppression of Photo Array

The Appellant Bennett argues that the trial court "erred in not suppressing the photographic line-up of the defendant in that it was unduly prejudicial." Specifically, he contends that the photo identification procedure was unduly suggestive because the Appellant was the only person in the line-up who had a "lazy eye," and this characteristic made him stand out in the photographic array.

In *Neil v Biggers*, the United States Supreme Court established a two-part analysis to assess the validity of a pretrial identification. *Neil v. Biggers*, 409 U.S. 188, 198-99, 93 S. Ct. 375, 381-82 (1972). First, the court must determine whether the procedure used to obtain the identification was unduly suggestive. *Id.* at 198. A violation of due process has occurred if the identification procedure is so suggestive as to give rise to a very substantial likelihood of irreparable misidentification. *Id.* This standard has been adopted by our state's supreme court. *Bennett v. State*, 530 S.W.2d 511, 512-15 (Tenn. 1975). Second, if the identification was unduly suggestive, the court must determine, under the totality of the circumstances, whether the identification is nevertheless reliable. *Neil v. Biggers*, 409 U.S. at 199. A finding that the pre-trial identification was unreliable will also require the exclusion of a subsequent in-court identification by the same witness. *State v. Philpott*, 882 S.W.2d 394, 400 (Tenn. Crim. App.), *perm. to appeal denied*, (Tenn. 1994). Although an identification process may be suggestive, it may satisfy due process as reliable and admissible if the totality of the circumstances so warrant. *State v. Brown*, 795 S.W.2d 689, 694 (Tenn. Crim. App. 1990). Factors to be considered in determining whether a violation of due process has occurred are:

(1) the opportunity of the witness to view the criminal at the time of the crime;

(2) the witness' degree of attention at the time of the crime;

(3) the accuracy of the witness' prior description of the criminal;

(4) the level of certainty demonstrated at the confrontation; and

(5) the time elapsed between the crime and the confrontation.

*Neil v. Biggers*, 409 U.S. at 199; s*ee also Philpott*, 882 S.W.2d at 400.

In reviewing a denial of a motion to suppress, this court looks to the facts adduced at the suppression hearing which are most favorable to the prevailing party. *State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000) (citing *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). In considering the evidence presented at the hearing, this court extends great deference to the fact-finding of the suppression hearing judge with respect to weighing credibility, determining facts, and resolving conflicts in the evidence. *Id.; see also State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001). Indeed, these findings will be upheld unless the evidence preponderates otherwise. *Daniel,* 12 S.W.3d at 423. In this case, the trial court denied the Appellant's motion to suppress, finding that:

> There was no evidence or argument presented at the hearing that the procedure conducted by Detective Baltimore was suggestive in any way. The detective explained the process used in constructing the lineup is computerized and that he had no control over where the pictures are placed on the sheet. The photographic arrays depicted African American individuals with very similar facial characteristics, hair color, and hair length. A photo line-up such as this is unduly suggestive only where the other photo participants are "grossly dissimilar." *See State v. Edwards*, 868 S.W.2d 682, 694 (Tenn. Crim. App. 1993). The participants included in both of the photographic line-ups are clearly not "grossly dissimilar" in appearance. In fact, many of the photos are strikingly similar. Additionally, the testimony of Detective Baltimore and Mr. Tyler Sr. indicated that the photo arrays were presented in a non-suggestive manner. When presenting the arrays to the victims, Det. Baltimore gave no indication that either of the defendant's pictures would be included.

Additionally, the trial court, applying *Neil v. Biggers*, found that: (1) Mr. Tyler Sr. had a sufficient opportunity, between twenty-five to thirty-five minutes, to view the Appellant at the time of the crime; (2) because of the nature of the crime, Mr. Tyler Sr. had a high degree of attention at the time of the incident; and (3) the level of certainty and the length of time between the crime and the identification favored admissibility.

In the instant case, the record clearly supports the trial court's finding that the photo identification procedure was not unduly suggestive. The individuals in the photographs are "strikingly similar." Contrary to the assertions of the Appellant, his "lazy eye" does not make him stand out in the photographic array. Mr. Tyler's identification was not aided by the officer. Furthermore, we agree with the trial court's application of *Neil v. Biggers*. Mr. Tyler had a sufficient opportunity to view the Appellant at the time of the crime and had a high degree of attention at the time of the incident. He exhibited a high level of certainty at the confrontation, identifying the Appellant in "about thirty seconds to a minute, minute and a half or so," and the length of time between the crime and the identification was relatively short, three days. Therefore, we conclude the trial court properly denied the motion to suppress. This issue is without merit.

### III. Sufficiency of the Evidence

The Appellant Bennett argues that the evidence introduced at trial was insufficient to support his convictions for first degree murder, attempted first degree murder, and two counts of especially aggravated robbery. We recite the Appellant's sufficiency argument in its entirety:

> In this case, there was no physical evidence linking the defendant to the scene of the crime. All of the items found recovered were from the alley way - a public area. There is no link between those items and the defendant in this case.

> Mr. Tyler identifies the defendant as the person in the house, but he also admitted that the person in the house had a mask over his face.

A jury conviction removes the presumption of innocence with which a defendant is cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). In determining the sufficiency of the evidence, this court does not reweigh or reevaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Likewise, it is not the duty of this court to revisit questions of witness credibility on appeal, that function being within the province of the trier of fact. *State v. Holder*, 15 S.W.3d 905, 911 (Tenn. 1999); *State v. Burlison*, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993). Instead, the Appellant must establish that the evidence presented at trial was so deficient that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994). Moreover, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

First degree murder is defined as "a premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (1997). Attempted first-degree murder also requires proof that the attempted murder was premeditated and intentional. The statute defines premeditation as follows:

"[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d) (1997); *see also State v. Sims*, 45 S.W.3d 1, 8 (Tenn. 2001). Intentional conduct, with regard to the Appellant's convictions, for murder and attempted murder, refers to a person who acts intentionally with respect to a result of the conduct when it is the person's conscious objective or desire to cause the death of the alleged victim. Tenn. Code Ann. § 39-11-106(a)(18) (1997); *see also State v. Page*, No. M2001-01853-CCA-R3-CD (Tenn. Crim. App. at Nashville, Apr. 16, 2002). Especially aggravated robbery is a robbery, defined as "the intentional or knowing theft of property from the person of another by violence or putting in fear," accomplished with a deadly weapon and where the victim suffers serious bodily injury. Tenn. Code Ann. §§ 39-13-401, -403 (1997).

The proof, in the light most favorable to the State, established that, Mr. Tyler positively identified the Appellant from a photo array and again at trial. The Appellant's co-defendants testified that they stopped at the Tyler residence and Bennett and Mays went inside the home and returned to the vehicle with "a safe and guns in their hands." After splitting up the money, the revolver, the safe, a pair of gloves, and a dark shirt were thrown in an alley near the Appellant's girlfriend's residence. The determination of the weight and credibility of the testimony of witnesses and reconciliation of conflicts in that testimony are matters entrusted exclusively to the trier of fact, and not this court. *State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Likewise, the credibility of eyewitness testimony identifying the accused as the perpetrator of the criminal offense for which he stands trial is a question of fact for the determination of the jury upon consideration of all competent proof. *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App.1993). The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made. *Id.* at 87-88. Despite the numerous conflicts within the proof at trial, as the arbiters of the credibility of the witnesses, the jury chose to accredit the testimony of the State's witnesses and reject the claims of the Appellant. The Appellant has had his day in court. This court may not reevaluate the evidence or substitute its inferences for those drawn by the trier of fact from the evidence. *Cabbage*, 571 S.W.2d at 835.

The testimony of the accomplices, Eric Booth and Tywaun Morrow, and the corroborating testimony of the victim, Mr. Tyler, sufficiently supports the Appellant's convictions. Their testimony is not so improbable or unsatisfactory as to create a reasonable doubt of the Appellant's guilt. Accordingly, we find that this issue is without merit.

## IV. Sentencing

The Appellant Bennett argues that a life sentence plus fifty years as imposed by the trial court was excessive.[2] He contends that the trial court misapplied enhancement factors. When an accused challenges the length, range, or the manner of service of a sentence, this court has a duty to conduct a *de novo* review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d) (1997); *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *Ashby*, 823 S.W.2d at 169. When conducting a *de novo* review of a sentence, this court must consider: (a) the evidence, if any, received at the trial and the sentencing hearing; (b) the pre-sentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) any statutory mitigating or enhancement factors; (f) any statement that the Appellant made on his own behalf; and (g) the potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. § 40-35-102, -103, -210 (1997); *Ashby*, 823 S.W.2d at 168. Furthermore, we emphasize that facts relevant to sentencing must be established by a preponderance of the evidence and not beyond a reasonable doubt. *State v. Winfield*, 23 S.W.3d 279, 283 (Tenn. 2000) (citing *State v. Poole*, 945 S.W.2d 93, 96 (Tenn. 1997)).

If our review reflects that the trial court followed the statutory sentencing procedure, imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and made findings of fact that are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result. *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). However, where the trial court fails to comply with the statutory provisions of sentencing, appellate review is *de novo* without a presumption of correctness. In the case before us, the record demonstrates that the trial court did not properly consider relevant sentencing principles. Accordingly, we do not apply the presumption.

In determining the Appellant's sentence, the trial court considered six enhancement factors: (1) The Appellant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; (2) The Appellant was the leader in the commission of the offense involving two or more criminal actors; (3) The offense involved more than one victim; (6) The personal injuries inflicted upon or the amount of damage to property

[2]The Appellant's sentence was calculated as follows: Count I - first degree murder, life imprisonment; Count II - felony murder, merged with Count I; Count III - especially aggravated robbery, twenty-five years at 100%; Count IV - attempted first degree murder, twenty-five years at 30%; Count V - especially aggravated robbery, twenty-five years at 100%. Counts III and IV were run consecutive to Count I, and Count V was to run concurrent with Count III, resulting in a total sentence of life imprisonment plus fifty years.

sustained by or taken from the victim was particularly great; (9) The Appellant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense; and (10) The Appellant had no hesitation about committing a crime when the risk to human life was high. Tenn. Code Ann. § 40-35-114(1), (2), (3), (6), (9), (10) (1997). These factors were used to enhance the Appellant's class A felony convictions within the appropriate range, fifteen to twenty-five years. Tenn. Code Ann. § 40-35-112(a)(1) (1997).

The Appellant does not challenge the application of enhancement factors (1) and (9) to each conviction. We agree. The Appellant's criminal history includes "one prior felony that involved a (sic) eighteen-month sentence."[3] Such past criminal behavior adequately supports application of enhancement factor (1) above to all of the Appellant's convictions. Furthermore, the record unquestionably shows that the Appellant possessed a firearm during the commission of the offense. Accordingly, enhancement factor (9) does apply to the Appellant's conviction for attempted first degree murder.[4]

With regard to contested enhancement factor (2), the Appellant was the leader in the commission of the offenses, we find that the proof in the record supports its application. Clearly, it was Bennett and Mays who exited the vehicle, leaving behind Morrow and Booth, and entered the Tyler residence with the intent to commit a robbery therein. The Appellant carried an "Uzi-type weapon, and was holding that weapon on Mr. Tyler and Mr. – and the children that were in the house." This court has held that "enhancement for being a leader in the commission of an offense does not require that the Appellant be the sole leader but only that he be 'a' leader" in the commission of the offense. *State v. Hicks*, 868 S.W.2d 729, 731 (Tenn. Crim. App. 1993) (citation omitted). Based upon these facts, we find the Appellant was a leader in the commission of these offenses. Accordingly, we find the trial court's application of enhancement factor (2) to all of the Appellant's convictions was, therefore, proper.

The offenses involved more than one victim. This court has defined "victim," as used in Tennessee Code Annotated § 40-35-114(3), as being limited in scope to a person or entity that is injured, killed, had property stolen, or had property destroyed by the perpetrator of the crime. *State v. Raines*, 882 S.W.2d 376, 384 (Tenn. Crim. App.), *perm. to appeal denied*, (Tenn. 1994). This court has also held that factor (3) may not be applied to enhance a sentence when the Appellant is separately convicted of the offenses committed against each victim. *State v. Freeman*, 943 S.W.2d 25, 31 (Tenn. Crim. App. 1996), *perm. to appeal denied*, (Tenn. 1997); *State v. Williamson*, 919 S.W.2d 69, 82 (Tenn. Crim. App. 1995) (citations omitted). Additionally, our supreme court has held that there cannot be multiple victims for any one offense where the indictment specifies a named victim. *State v. Imfeld*, 70 S.W.3d 698, 706 (Tenn. 2002). Because the Appellant was convicted of offenses involving specific named victims in the indictments for first degree murder,

---

[3] A presentence report is not included in the record.

[4] Enhancement factor (9) would not apply to the Appellant's convictions for especially aggravated robbery because employment of a firearm is an element of the offense. *See* Tenn. Code Ann. § 39-13-403 (1997).

attempted first degree murder, and two counts of especially aggravated robbery, the trial court improperly applied enhancement factor (3) during sentencing to all convictions.

The trial court applied enhancement factor (6), the personal injuries inflicted upon Mr. Tyler were particularly great, to the Appellant's conviction for attempted first degree murder. In any homicide case, the personal injuries inflicted upon the victim are by definition "particularly great" because the killing of a person necessarily includes the infliction of great bodily injury. *See State v. Jones*, 883 S.W.2d 597, 602 (Tenn. 1994)*; Williamson*, 919 S.W.2d at 82; *State v. Lambert*, 741 S.W.2d 127, 134 (Tenn. Crim. App.), *perm. to appeal denied*, (Tenn. 1987); *State v. Brogan*, No. E2001-00712-CCA-R3-CD (Tenn. Crim. App. at Knoxville, July 25, 2002). However, this rationale does not apply to *attempted* homicide cases because the infliction of great bodily injury is not required to sustain a conviction, the Appellant need only attempt to inflict great bodily injury. Thus, the trial court properly used this factor to enhance the Appellant's sentence within the appropriate range.

Finally, enhancement factor (10), the Appellant had no hesitation about committing a crime when the risk to human life was high, was also used to enhance the Appellant's sentence. The trial court found that this factor applied because

> you had not only one person killed and one person shot in the head, but for this enhancing factor, you had young children, according to my recollection, who were – at least, at the time the guns were being discharged, Mr. Tyler sees them running around the house and, at some time during the testimony, indicated that Mr. Bennett was holding the gun, both on Mr. Tyler and making sure no one in the living room, the children, were causing any problems.

Enhancement factor (10) may be applied where the Appellant creates a high risk to the life of a person other than the victim, because the facts establishing the enhancement factor would be separate from the facts necessary to establish a high risk of death to the victim. *Jones*, 883 S.W.2d at 603; *Williamson*, 919 S.W.2d at 83*; State v. Bingham*, 910 S.W.2d 448, 453 (Tenn. Crim. App. 1995), *overruled on other grounds*, (*State v. Hooper*, 29 S.W.3d 1, 9 (Tenn. 2001)); *Lambert*, 741 S.W.2d at 134. Since the evidence certainly suggests that this was the case, use of factor (10) is proper for enhancing all of the Appellant's sentences.

When there are enhancement factors and no mitigating factors, there is no presumptive sentence and the court may sentence above the minimum in the range. Tenn. Code. Ann. § 40-35-210(d) (1997). Enhancement factors (2), (6), and (10) are of particular weight in this case to the above referenced convictions. Under these circumstances, the trial court was justified in imposing a sentence of life imprisonment plus fifty years.

**CONCLUSION**

Based upon the foregoing, we find that the trial court did not err in allowing a juror to remain on the panel after reading a newspaper article recounting trial testimony or in denying the motion to suppress the photographic array. The evidence was sufficient to sustain the Appellants' convictions. We further conclude that the sentence of life imprisonment plus fifty years imposed by the trial court was not excessive as to length. Accordingly, the judgment of the Davidson County Criminal Court is affirmed.

_____
DAVID G. HAYES, JUDGE